[Civ. No. 15210.   Second Dist., Div. One.   Aug. 1, 1946.]

PAULA THORPE, Appellant, v. CARLYLE THORPE, Respondent.

Hahn & Ross and Phillip W. Silver for Appellant.

Wm. M. Rains for Respondent.

YORK, P. J.—Plaintiff filed her complaint for separate maintenance on July 20, 1943, based on the ground of extreme cruelty, and prayed for an award of all of the community property, $1,000 per month for her support and maintenance, attorneys' fees and costs. Defendant answered, denying the alleged acts of cruelty and alleging that by virtue of the provisions of an antenuptial agreement there was no community property. Simultaneously, defendant filed a cross-complaint for divorce upon two grounds: (a) Cruelty and (b) adultery. A demurrer to said cross-complaint was sustained, and sometime thereafter, apparently through agreement between counsel for the parties, plaintiff filed her answer to the original cross-complaint. On the issues so raised the cause went to trial and was submitted for decision on March 31, 1944. On April 27, 1944, defendant filed his first amended cross-complaint to conform to proof, permission to do so having been duly granted by the trial court, and on the same day plaintiff filed her answer to said amended cross-complaint.

The trial court found in favor of defendant husband on all the allegations of cruelty and adultery contained in his amended cross-complaint; that there was no community property and that the antenuptial agreement was a valid and binding contract between the parties. The court also specifically found against the plaintiff as to each and every act of cruelty charged in her complaint, and awarded an interlocutory judgment of divorce to defendant husband, wherein it was adjudged that plaintiff wife should receive no alimony and no support or maintenance from defendant, and that said plaintiff was not entitled to a decree of separate maintenance.

This appeal is prosecuted by plaintiff, who urges: (1) That the court abused its discretion in denying her motion for a continuance of the trial made on the ground that she was ill and unable to attend the trial; (2) that the court erred in receiving evidence of acts of adultery in making findings thereon and in permitting the filing of an amended cross-complaint to conform to proof, without proof of service of said cross-complaint upon the correspondents; (3) that the court erred in finding the antenuptial agreement valid from its inception and binding upon the parties thereto.

In connection with her first point, appellant urges that the court's denial of a continuance amounted to an abuse of discretion because she was thereby deprived of the opportunity

of attending the trial and testifying in person as to the circumstances under which the antenuptial agreement was entered into and of controverting the charges of adultery and extreme cruelty.

As a matter of fact, on various dates in September and October of 1943, the deposition of appellant was taken. This deposition of two hundred and seventeen pages covers all of the issues raised at the trial and covers item by item, and specifically, the facts presented by respondent in his defense and by his cross-complaint. Although taken under section 2055, Code of Civil Procedure, by respondent, it was so complete that appellant's counsel read it into the record as appellant's evidence and as her testimony in support of her case in chief.

An examination of the record herein discloses that when the cause was first called for trial on January 25, 1944, the court granted appellant's motion for a continuance to February 2, 1944, which was based upon (1) the affidavit of Alfred E. Koehler, M.D., appellant's attending physician, dated January 20, 1944, giving as his opinion that "by reason of illness from which the said Paula Thorpe is suffering . . . she will be confined to her bed and under my care for a period of four weeks or more and that . . . she will not be able to undergo the strain of a trial for a period of at least two and a half months or longer." (2) The counteraffidavit of Franklin R. Nuzum, M. D., dated January 21, 1944, to the effect that appellant's condition was such that it would not be detrimental to her physical health to appear in court in Los Angeles January 25, 1944.

At the request of the judge, who granted the continuance from January 25, to February 2, 1944, George N. Thompson, M. D., thoroughly examined appellant on January 30, 1944, at the Cottage Hospital at Santa Barbara, where she was then confined, and also consulted with Doctors Nuzum and Koehler; as a result of which he gave as his opinion that "For the medical welfare of the patient it would seem inadvisable to recommend that she go through a court appearance at the time when she is having undiagnosed temperature rise and her physician is in the process of determining the cause for this. However, in view of all the foregoing it would seem that a period of one month should be sufficient to complete all the necessary studies in the case and to build up the patient suf-

ficiently to undergo a court hearing. If at that time her personal physician still believes she is unable to attend a hearing, I believe a further evaluation of the case based on another examination at that date should be made.''

When the matter was again called on February 2, 1944, it was continued to March 21, 1944, the order of continuance containing the proviso: ''No further continuances to be granted.'' On March 21, 1944, appellant's motion for further continuance was denied. On that date, the following additional affidavits were before the court: (1) That of Dr. Alfred E. Koehler, under whose care appellant had been since January 5, 1944, in which he averred that ''by reason of illness from which the said Paula Thorpe is suffering . . . she should continue to remain in the hospital under close observation for a period of at least several months, and that she will not be able to undergo the strain of a trial for a period of at least three months or longer.'' (2) The affidavit of Arthur Bruce Steele, M. D., who examined appellant at the request of respondent's attorney with the full consent of appellant and her physician, Dr. Koehler. Based upon his ''examination of Mrs. Thorpe, the history, the hospital records and Dr. Koehler's statements,'' Dr. Steele gave as his opinion ''that it will not work any harm to Mrs. Thorpe to appear at the trial in Los Angeles on March 21, 1944. I anticipate that Mrs. Thorpe will be highly emotional in court and probably suffer from some hysteria, but, in my judgment, this would be true now, or six months from now. In other words, it is my opinion that the hysteria which she manifests is an expression of her desire to avoid a severance of the marital status under the present conditions.'' (3) The affidavit of Dr. Edward B. Jones to the effect that respondent Carlyle Thorpe had been his patient for a great many years; that as a result of his examination of such patient on March 15, 1944, he found that Mr. Thorpe was suffering from stomach ulcers of long standing; that the pendency of his marital litigation ''is the producing cause of his worsened condition and the aggravation of his disease''; that he should be hospitalized for at least six months, ''if he is to have any hope of being cured but such confinement would be unavailing toward that purpose if the distress of this lawsuit is not first ended. I am definitely of the opinion that the postponement of the trial of this case will further aggravate his condition, very

materially diminish his chances of recovery and probably shorten his life.''

Quoting from *Johnson* v. *Johnson*, 59 Cal.App.2d 375, 392 [139 P.2d 33] : ''The rules applicable to granting of continuances, amply supported by citations to the many cases, are set forth in 5 Cal.Jur., page 968, section 5, as follows: 'However, it is a settled rule of practice that an application for a continuance is addressed to the sound discretion of the trial court, and its ruling will not be reviewed except for the most cogent reasons. The trial court is apprised of all the circumstances of the case and the previous proceedings, and is, therefore better able to decide upon the propriety of granting the application than an appellate court; and when it exercises a reasonable, and not an arbitrary discretion, its action will not be disturbed. It follows that an abuse of discretion must be shown to justify a reversal of the judgment because of a ruling on such matters. Thus it has been held that the sickness of a party to an action, preventing his attendance on the court, does not *ipso facto* require the court to grant an application for a continuance, made on his behalf; especially where the showing before the court fully justifies the conclusion that injustice will be as likely to follow from the granting of the continuance as from its refusal. . . .'

''As has already been pointed out, the right of a litigant to be present to defend or prosecute an action is not absolute.''

It also seems to be a general rule that ''the mere absence of a party furnishes no ground for a continuance, unless it is made to appear that such absence is unavoidable and that the party will suffer damage in his interests if he is unable personally to attend the trial; and even when a prima facie showing of these essentials is made, if there is presented a counter showing, then it becomes the duty of the trial court to resolve the facts and no claim of abuse of discretion can be predicated upon its action. . . . Although continuances should, under proper circumstances, be granted because of the illness of a party, sickness preventing attendance on the court does not ipso facto require the granting of an application for a continuance, made on a party's behalf. As in all other cases, it is for the court, except where otherwise expressly provided by statute, to determine whether or not the circumstances shown upon the application are such as make it proper that con-

tinuance should be granted, and its conclusion, as in other cases, will not be disturbed unless there has been a plain abuse of discretion." (5 Cal.Jur. §§ 10 and 11, pp. 978, 979, and authorities there cited, including *Meier* v. *Hayes,* 20 Cal.App. 2d 451, 455 [67 P.2d 120] ; *Foster* v. *Hudson,* 33 Cal.App.2d 705 [92 P.2d 959] ; *Capital Nat. Bank* v. *Smith,* 62 Cal.App. 2d 328, 339 [144 P.2d 665].)

Giving full effect to the facts presented by the record herein, it may not be said that the trial court abused its discretion in refusing to grant a third continuance.

■ With respect to appellant's second point, i. e., error of the court in receiving evidence of acts of adultery, making findings thereon and permitting the filing of the amended cross-complaint to conform to proof, without proof of service upon corespondents, the trial court found that "The Corespondent John L. Scroggs, named as Doe One, and the Corespondent Joseph L. Hoover, named as Doe Two, were respectively duly and regularly served with and notified of the allegations of the cross-complaint filed herein." The original cross-complaint alleged that appellant committed adultery with corespondents named therein as Does One, Two and Three, which was denied by appellant's answer thereto and thereby raised the issue. The depositions of corespondents Hoover and Scroggs were read in evidence at the trial without objection, and after completion of the trial, respondent was permitted to amend his cross-complaint to conform to proof. Under such circumstances, service of the original cross-complaint upon said corespondents was a sufficient compliance with the provisions of section 1019 of the Code of Civil Procedure, which gives such persons the right to appear and be heard in the action.

■ Appellant finally specifies as reversible error the court's finding that the antenuptial agreement was valid and binding and that consequently there was no community property.

With respect to such agreement, the court found: "That it is true that prior to the marriage of the parties hereto, to-wit: on the 20th day of March, 1940, the parties hereto entered into an Antenuptial Agreement. The Court finds that the said Antenuptial Agreement was from its inception and ever since has been and now is a valid and binding agreement between . . . the parties thereto, in words and figures as follows, to-wit: . . ."

In this regard the court further found that *it was not true* that said agreement was executed subsequent to the marriage; that appellant's consent or execution was secured by fraud, misrepresentation or deceit; that said plaintiff was falsely advised that such document "was of no force or effect in so far as the subsequent accumulations of property were concerned or in so far as the support" of appellant was concerned. In addition, the court found that *it was not true* that prior to the execution of the agreement, or at any other time, respondent told appellant that "he would provide for her financially for as long as she lived in an amount of money sufficient to support her upon the same or any standard of living" of appellant and respondent at said time or at any time or at all. The court also found that "no fraudulent, false or deceitful statements or misrepresentations of any kind or character whatsoever" were at any time made by respondent to appellant in connection with the making, execution or delivery of said antenuptial agreement and that no reliance was placed thereon by appellant, "nor was she induced or persuaded to affix her signature" thereto by reason of any such purported statements. Also, that no confidential relationship of husband and wife existed between the parties at the time of the execution of said document.

The court then concluded: That "there is no community property of the parties hereto. . . . That the Antenuptial Agreement entered into between the parties hereto dated March 20, 1940, was entirely from its inception and ever since has been and now is entirely a valid, binding and effective agreement between the parties thereto."

By its terms the antenuptial agreement provided that each party "after said contemplated marriage, shall possess, hold, own and enjoy all of the property which he (or she) then owns, and which he (or she) may thereafter acquire by gift, inheritance, purchase or otherwise, together with the accretions thereto and the accumulations therefrom, and all of his (or her) earnings subsequent to the said marriage, as his (or her) sole and separate property as absolutely as if he (or she) were to remain unmarried."

While the earnings of a husband during the marriage are normally the community property of the spouses, as is contended by appellant, the parties herein each relinquished to the other all right, title and interest in any property which he or she

"might but for the provisions of this agreement, acquire by reason of the said contemplated marriage." There was competent evidence presented at the trial herein to substantiate the findings of fact made respecting the antenuptial agreement.

The judgment is affirmed.

Doran, J., and White, J., concurred.