EDWIN DOTY AND JOYCE DOTY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16089–80.     Filed September 28, 1983.

*Jerry H. Robinson* and *F. Jan Blaustein*, for the petitioners.
*Elizabeth I. Abreu*, for the respondent.

STERRETT, *Judge*: By notice of deficiency dated June 12, 1980, respondent determined deficiencies in petitioners' Federal income taxes in the amounts of $107,916, $92,976, and $118,743 for the years 1975, 1976, and 1977, respectively. The sole issue for decision is whether the income received by petitioner Joyce Doty pursuant to her marriage settlement agreement constituted earned income under former section 1348, I.R.C. 1954.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference.

Petitioners Edwin Doty and Joyce Doty resided in Healdsburg, Calif., at the time of filing the petition herein. Edwin Doty is a party to this proceeding solely by reason of having filed a joint income tax return with Joyce Doty (hereinafter petitioner). They timely filed joint Federal income tax returns for the calendar years 1975, 1976, and 1977 with the Internal Revenue Service Center, Fresno, Calif.

Prior to her marriage to Edwin Doty, petitioner was married to Charles M. Schulz, the creator and author of the cartoon strip entitled "Peanuts." Petitioner and Mr. Schulz were married in Minnesota during 1949 and remained so until 1973.

---

[1]Sec. 1348 was repealed by the Economic Recovery Act of 1981. Pub. L. 97–34, sec. 101(c)(1), 95 Stat. 172, 183.

They moved to California in July of 1958 and have resided there continuously ever since.

On June 14, 1950, Mr. Schulz entered into an agreement with United Feature Syndicate, Inc. (hereinafter the syndicate), whereby he agreed to produce a cartoon strip entitled "Li'l Folks." Under the terms of this agreement, Mr. Schulz granted the syndicate the exclusive rights to the cartoon and characters contained therein in exchange for a sum equal to 50 percent of the net proceeds received by the syndicate from the sale or other disposition of the cartoon and its characters. The agreement had an original term of 5 years and was renewed by the syndicate for an additional 5 years.

On October 1, 1959, Mr. Schulz and the syndicate executed a new agreement (the syndicate agreement), which superseded the June 14, 1950, agreement. The syndicate agreement set forth the rights and obligations of Mr. Schulz and the syndicate with respect to the cartoon strip "Peanuts." The syndicate agreement together with its four amendments, dated October 30, 1966; August 7, 1967; March 19, 1973; and August 1, 1974, were in effect during the years in question.

Under the terms of the syndicate agreement, Mr. Schulz agreed to write, draw, color, produce, and deliver to the syndicate 312 different installments of the "Peanuts" cartoon strip in form suitable for daily publication in newspapers or other periodicals at a time at least 6 weeks prior to the scheduled release of each such installment. Additionally, Mr. Schulz agreed to provide the syndicate with 52 different installments of the "Peanuts" cartoon strip in form suitable for publication in Sunday newspapers at a time at least 12 weeks prior to the scheduled release of each such installment. In exchange for Mr. Schulz' providing the syndicate with these installments, the syndicate agreed to use its best efforts to market the installments and to pay Mr. Schulz a sum equal to 50 percent of the net cash proceeds it received from the sale or other disposition of the installments.

In addition, under the provisions of the syndicate agreement, Mr. Schulz also agreed that during the term of the agreement, the syndicate would have the entire, exclusive, and worldwide right, title, and interest in and to the "Peanuts" cartoon and characters, including the motion picture, radio, dramatic, television, magazine, and book publishing rights and

the right to reproduce the cartoon characters in the form of toys, novelties, games, and other merchandise. In exchange, the syndicate agreed to pay to Mr. Schulz 50 percent of the net cash proceeds it received from the sale of any of the various licenses that it had been granted under the terms of the agreement.

Thus, Charles M. Schulz had one principal obligation under the terms of the syndicate agreement: to draw the "Peanuts" cartoon. The royalties that he received under the syndicate agreement were attributable to his personal efforts and neither his nor petitioner's capital was a material income-producing factor.

The syndicate placed the "Peanuts" cartoon installments it was provided by Mr. Schulz in various daily and Sunday newspapers and entered into licensing agreements with numerous companies that produced novelties, motion pictures, television programs, and books based on the characters in "Peanuts," including "Charlie Brown," "Snoopy," "Lucy," "Linus," and "Woodstock." From these activities, the syndicate received various royalties, a portion of which was payable to Mr. Schulz pursuant to the terms of the syndicate agreement. The net cash proceeds payable by the syndicate fall into the following general categories:

(a) Proceeds from granting licenses to others to use the "Peanuts" characters (hereinafter novelties). Examples of these proceeds are amounts received from the use of characters on greeting cards, toys, television commercials, and clothing.

(b) Proceeds from the "Peanuts" cartoon page appearing in the Sunday or the weekly newspapers (hereinafter page receipts).

(c) Proceeds from the daily, four-frame "Peanuts" cartoon strips appearing in newspapers (hereinafter strip receipts).

(d) Proceeds from the sale of books (hereinafter publishing).

Pursuant to the syndicate agreement, the syndicate kept full and accurate books of account showing all receipts from its sale of the "Peanuts" cartoons and rights to the "Peanuts" characters. Although the terms of the various licensing agreements varied with respect to the time payments were due to the syndicate, in each agreement, all proceeds due the syndicate were payable to the syndicate less than 1 year from

the time the sale occurred or revenue was received by the licensees or distributors.

Petitioner and Charles M. Schulz separated on November 15, 1972, and on December 11, 1972, petitioner filed a petition in the California Superior Court for a dissolution of their marriage. A final judgment of dissolution of marriage was entered by the Superior Court on August 7, 1973; however, the court reserved jurisdiction with respect to a division of the community property of the parties.

Petitioner and Charles M. Schulz entered into a marriage settlement agreement on October 17, 1973. The negotiations for this agreement commenced in 1972 and continued throughout most of 1973. At the time of the negotiations, Mr. Schulz was still obligated under the syndicate agreement to continue drawing the "Peanuts" cartoon for a period of around 6 years. Consequently, the parties recognized during the negotiations of the marriage settlement agreement, that to the extent Mr. Schulz continued to draw the "Peanuts" comic strip, he was acquiring a separate property interest.

All of the other property owned by petitioner and Mr. Schulz at the time of their separation was community property pursuant to California law. The marriage settlement agreement equally divided all of their property, with the exception of the syndicate agreement, on the basis of actual values. However, with respect to the syndicate agreement, the parties were unable to arrive at a fixed sum to reflect the value of petitioner's community interest in the syndicate agreement.

Petitioner and Mr. Schulz were in agreement that petitioner had a community property interest in the syndicate agreement as of June 30, 1973.[2] However, since Mr. Schulz intended to

---

[2]Specifically, the marriage settlement agreement provides:

"Husband and Wife agree that the community has developed a valuable right in and to the Syndicate Agreement. They agree that this right is of a unique nature and that the amount of income to be generated under this Agreement and the potential for increase or decrease in the amount makes it impossible to determine with any degree of accuracy the present value of the community interest in this Agreement. The determination of the value of the community interest is further complicated by the fact that Husband is obligated to and will continue to render services under this Agreement and that these continued services are necessary to maintain .the level of payments pursuant to the Syndicate Agreement.

"The interest of the community in the Syndicate Agreement as of June 30, 1973, [is] herein represented as a percentage of each monthly payment to be received pursuant to said Agreement as provided in subparagraph a. of this paragraph 3. Husband and Wife each agree that the interest of the community in and to these proceeds has been arrived at only

continue drawing, the parties recognized that not all of the future royalties payable under the syndicate agreement would be community income. Accordingly, in negotiating a division of the syndicate agreement, the parties agreed that some percentage of the future royalties would be attributable to Mr. Schulz' services while he was married to petitioner and would thus be community income, while the remainder would relate to Mr. Schulz' services after their divorce and would therefore be his separate property. The parties further agreed that petitioner's interest in the income stream should decline with the lapse of time, since as time passed, an increasingly higher percentage of the royalties paid out under the syndicate agreement would be attributable to Mr. Schulz' services after the termination of their marriage. Accordingly, under the terms of the marriage settlement agreement, the amount of the lifetime payments that Mr. Schulz agreed to pay to petitioner are based on the following percentages of the payments he receives from the syndicate:

| Period(s) ended | Percentage |
|---|---|
| 6/30/74 | 27 |
| 6/30/75 | 25 |
| 6/30/76 | 23 |
| 6/30/77 | 21 |
| 6/30/78 | 20 |
| 6/30/79 | 18 |
| 6/30/80 | 17 |
| 6/30/81 and 6/30/82 | 16 |
| Thereafter | 15 |

Although the parties assumed in the marriage settlement agreement that Mr. Schulz would continue to draw the "Peanuts" comic strip, petitioner's share of the royalties remains the same even if Mr. Schulz stops drawing the comic

---

after extensive negotiations between their attorneys and accountants and that in the opinion of both Husband and Wife as well as that of their respective advisors, this represents an equal division of the community interest in and to the future proceeds to be received under the Syndicate Agreement. The payments reflected in subparagraph a. of this paragraph 3 represent to Husband and Wife the full amount of their community interest in and to the Syndicate Agreement as of June 30, 1973. The balance of the proceeds received under the Syndicate Agreement are the sole property of Husband representing payment for his services rendered after June 30, 1973 under the Syndicate Agreement. * * * "

strip. Furthermore, the marriage settlement agreement provides that:

In the event [Charles M. Schulz] either partly or wholly abandons the present strip in favor of some other strip not related to the present strip and the publication of said strip is not controlled by United Features under its present agreement with [Charles M. Schulz], then it is agreed that if the effect of this new strip reduces the amount of income that [petitioner] is to receive under paragraph 3 of Article IV of this Agreement, then there shall be paid to [petitioner] by [Charles M. Schulz] out of the proceeds of the new strip such amounts as will compensate her for any loss of income which she suffers as a direct result of the publication of the new strip; provided, however, that the percentage of the income of the new strip to be paid to the [petitioner] hereunder shall not exceed the percentage that she receives as her share of the Syndicate Payments under paragraph 3 of Article IV.

The marriage settlement agreement also provides that petitioner's share of the syndicate's payments will cease upon her death, unless she is survived by a child or children from her marriage to Mr. Schulz. In that event, petitioner is provided with a limited power of appointment to distribute the payments she would be otherwise entitled to under the terms of the marriage settlement agreement if she were alive.

The marriage settlement agreement was approved by the California Superior Court on June 6, 1974, which found the division of the community property constituted an equal division. Petitioner and Mr. Schulz carried out the terms of the marriage settlement agreement. With respect to the syndicate agreement, when Mr. Schulz received a payment from the syndicate, his accountant would compute the portion payable to petitioner under the terms of the marriage settlement agreement and Mr. Schulz would then remit that amount to petitioner.

The amounts received by Mr. Schulz pursuant to the syndicate agreement during the tax years in question were substantial as set forth below:

| 1975 | $3,288,916 |
| 1976 | 3,807,676 |
| 1977 | 5,106,599 |

These amounts break down into the following categories:

|  | 1975 | 1976 | 1977 |
| --- | --- | --- | --- |
| Novelties | $2,406,914 | $2,997,737 | $4,210,652 |
| Page receipts | 232,053 | 236,737 | 216,703 |
| Strip receipts | 269,407 | 274,895 | 319,991 |

| | | | |
|---|---|---|---|
| Publishing | $380,137 | $298,218 | $358,233 |
| Miscellaneous | 405 | 89 | 1,020 |

Pursuant to the marriage settlement agreement, petitioner received $777,095, $825,149, and $1,037,176 from Mr. Schulz during the years 1975, 1976, and 1977, respectively. She reported these amounts on her Federal income tax returns for those years as "earned income" subject to the maximum tax rate under section 1348.

In his statutory notice of deficiency, respondent determined that the amounts received by petitioner under the marriage settlement agreement during 1975, 1976, and 1977 did not constitute personal service income or earned income within the meaning of section 1348(b) and thus did not qualify for the 50-percent maximum tax rate.

## OPINION

The ultimate issue for our decision is whether the income received by petitioner under the marriage settlement agreement constituted earned income, thereby entitling her to the benefits of section 1348 during the tax years in question. However, before we can address this issue, we must first determine the nature of the income received by petitioner.

In the instant case, petitioner is the former wife of Charles M. Schulz, the creator of the comic strip, "Peanuts." At the time of his separation and divorce from petitioner, Mr. Schulz produced the "Peanuts" comic strip for United Feature Syndicate, Inc., pursuant to a syndicate agreement. Under this agreement, Mr. Schulz received royalties equal to 50 percent of the net cash proceeds the syndicate realized from the distribution of daily and Sunday comic strips and the licensing of the "Peanuts" characters. In their marriage settlement agreement, Mr. Schulz and petitioner agreed that she owned a community property interest in the future earnings he derived from the syndicate agreement to the extent such earnings were attributable to Mr. Schulz' services while he was married to petitioner. Accordingly, Mr. Schulz agreed to make lifetime payments to petitioner that are computed by multiplying the amounts he receives from the syndicate by specified percentages. Since Mr. Schulz intended to continue drawing for the syndicate, these percentages decline with the passage of time in recognition of the fact that an increasingly higher percent-

age of the royalties paid out under the syndicate agreement would be attributable to his services after the termination of their marriage. The marriage settlement agreement was approved by the Superior Court and pursuant to this agreement, petitioner received $777,095, $825,149, and $1,037,176 from Mr. Schulz during the tax years in question.

Respondent contends that any property interest petitioner may have had in the syndicate agreement was terminated by the marriage settlement agreement so that, consequently, the income she received pursuant to the marriage settlement agreement constituted her current separate property. We disagree. The nature of the amounts received by petitioner is necessarily determined by reference to California law. *United States v. Mitchell*, 403 U.S. 190, 195 (1971); *Poe v. Seaborn*, 282 U.S. 101, 110 (1930). Under California law, all tangible and intangible property acquired during marriage by a married person domiciled in California is community property. Cal. Civ. Code sec. 5110 (West 1983). The "spouses are seen as contributing equally to acquisition regardless of the actual division of labor in the marriage and regardless of which spouse actually 'earned' the property." *In re Marriage of Brigden*, 80 Cal. App. 3d 380, 389, 145 Cal. Rptr. 716, 723 (1978). "Each spouse's effort, time and skill are community assets * * * and any benefit derived therefrom belongs to both." (Citations omitted.) *In re Marriage of Hillerman*, 109 Cal. App. 3d 334, 338, 167 Cal. Rptr. 240, 241–242 (1980). Accordingly, the earnings of both husband and wife go into a common fund and become community income. *Washburn v. Washburn*, 9 Cal. 475 (1858); *Thorpe v. Thorpe*, 75 Cal. App. 2d 605, 171 P.2d 126, 130–131 (1946).

The separate or community character of property is fixed at the time of acquisition. Thus, to determine whether income attributable to one spouse's services constitutes community income, it is necessary to determine when the services were performed. If the services were performed during marriage, then the income received therefrom constitutes community income.

These principles were recognized by the Internal Revenue Service in Rev. Rul. 63–168, 1963–2 C.B. 9, 11, where it stated:

The earnings of either spouse acquired during marriage and domicile in California, except the earnings of a wife living separate and apart from her

husband, are community income. It is the status of the employee at the time his services are performed which determines whether compensation for such services is separate or community income for the reason that such compensation has its inception in the performance of services, and the inception of the right to receive income is the time at which its character as separate, or as community property is determined. *Claude R. Fooshe v. Commissioner*, 132 F.2d 686 ([9th Cir.] 1942).

Accordingly, the courts have found that uncollected accounts receivable of a practicing physician are community property, being the earnings of a husband during marriage. *Winn v. Winn*, 143 Cal. App. 2d 184, 299 P.2d 721, 725 (1956); *In re Marriage of House*, 50 Cal. App. 3d 578, 123 Cal. Rptr. 451 (1975). Similarly, in *In re Marriage of Brown*, 15 Cal. 3d 838, 126 Cal. Rptr. 633, 544 P.2d 561 (1976), the Supreme Court of California held that pension rights, whether or not vested, represent property interests, and to the extent that such rights derive from employment during coverture, they comprise a community asset subject to division in dissolution proceedings. Furthermore, the court found that the fact that the contract right in question was contingent upon future events did not degrade such property right to a mere expectancy. Additionally, in *Waters v. Waters*, 75 Cal. App. 2d 265, 170 P.2d 494 (1946), the court held that where the attorney husband had a contingent interest in a suit pending on appeal at the time of his divorce, his fee, when and if collected, would be a community asset.

During the 24 years that Mr. Schulz was married to petitioner, he developed the "Peanuts" characters and drew thousands of daily and Sunday comic strips. Obviously, a portion of the future royalties Mr. Schulz will receive under the syndicate agreement are attributable to his services during the term of their marriage. Thus, petitioner clearly had a community property interest in the syndicate agreement. In recognition of this interest, the parties made a good faith effort to divide this community property asset between petitioner and Mr. Schulz taking into account Mr. Schulz' obligation to continue to provide services under the syndicate agreement. Accordingly, the parties divided the royalty payments into those attributable to Mr. Schulz' services during the term of his marriage to petitioner and those attributable to his services after the marriage ended. In making these allocations, the parties recognized that the percentage of the royalty

payments received from the syndicate allocable to Mr. Schulz' services during the term of their marriage would decline with the passage of time. The parties then divided the royalties they estimated were allocable to Mr. Schulz' services during the term of their marriage equally between him and petitioner.

A similar division of community property interests in nonvested pension rights was recognized by the Supreme Court of California in *In re Marriage of Brown, supra.* In that case, the court held that:

In dividing nonvested pension rights as community property the court must take account of the possibility that death or termination of employment may destroy those rights before they mature. In some cases the trial court may be able to evaluate this risk in determining the present value of those rights. * * * But if the court concludes that because of uncertainties affecting the vesting or maturation of the pension that it should not attempt to divide the present value of pension rights, it can instead award each spouse an appropriate portion of each pension payment as it is paid. This method of dividing the community interest in the pension renders it unnecessary for the court to compute the present value of the pension rights, and divides equally the risk that the pension will fail to vest. * * * [*In re Marriage of Brown, supra* at 567. Citations and fn. ref. omitted.]

We find the division of the future royalties in the instant case to be in accordance with the guidelines for dividing future income streams approved by the Supreme Court of California in *In re Marriage of Brown.* Accordingly, based on our analysis of California community property law, we find that the income received by petitioner under the marriage settlement agreement represented her vested one-half interest in the future royalties to be received from the syndicate agreement that were attributable to the services performed by Charles M. Schulz while they were married.

Having resolved this preliminary issue, we now turn our focus to the tax treatment of the income in question. It is well settled that the amounts received by petitioner, representing her community property interest in the future royalties payable under the syndicate agreement, were properly taxable to her. *Johnson v. United States,* 135 F.2d 125 (9th Cir. 1943); *Hubner v. Commissioner,* 28 T.C. 1150 (1957).[3] Indeed, there is no dispute between the parties with respect to this point. The

---

[3]See also *Lowe v. Commissioner,* T.C. Memo. 1981–350.

question, simply stated, is whether the income received by petitioner constituted earned income under section 1348.

Section 1348(a), in the form in which it was in effect in 1975 and 1976, prescribed a 50-percent maximum tax rate limitation with respect to "earned taxable income."[4] Although section 1348 did not specifically define the term "earned income," section 1348(b) provided that it meant income that was earned income within the meaning of section 401(c)(2)(C) or section 911(b).

Section 911(b), as it was in effect during the tax years at issue, defined the term "earned income" to mean "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered." Section 401(c)(2)(C) in effect expanded on this definition providing in pertinent part as follows:

the term "earned income" includes gains (other than any gain which is treated under any provision of this chapter as gain from the sale or exchange of a capital asset) and net earnings derived from the sale or other disposition of, the transfer of any interest in, or the licensing of the use of property (other than good will) by an individual whose personal efforts created such property.

Although it seems clear that the royalties in this case would satisfy the requirements of earned income under section 401(c)(2)(C), the Service originally adopted a narrow view of what constituted earned income within the purview of section 911(b).[5] However, the courts have been much more lenient in their decisions. In *Robida v. Commissioner*, 460 F.2d 1172, 1175 (9th Cir. 1972), the Ninth Circuit held that, in deciding whether income constitutes earned income for purposes of section 911(b), "The key element is the presence or absence of capital as the income-producing factor." The court thus concluded that a slot machine artist was entitled to treat his proceeds from playing machines as earned income under section 911(b).

---

[4] The Tax Reform Act of 1976 changed the term "earned taxable income" to "personal service taxable income" for tax years beginning after Dec. 31, 1976. However, because the term "personal service income" continued to be defined by reference to the term "earned income," we will use the term "earned income" herein.

[5] We treat the effect of the word "or" in a subsequent portion of this opinion.

Similarly, in *Tobey v. Commissioner*, 60 T.C. 227 (1973), we were faced with the question of whether a taxpayer's earnings from the sale of his paintings constituted earned income within the meaning of section 911(b). The Commissioner argued that the income could not be section 911(b) earned income since there were no recipients of petitioner's services, just purchasers of his paintings; therefore, the income resulted from the sale of personal property and as such is not earned income. In rejecting the Commissioner's contentions, we stated—

We adhere to the view that the "earned income" requirement was designed merely to prevent the exclusion of passive income, such as rental income, interest, and dividends. If Congress had intended the existence of a *product* of personal efforts to be fatal, it would not have provided, as it did in the last sentence of 911(b), for a minimum allocation of a stated percent of net profits to personal services where both personal services and capital are income-producing factors, since such businesses often result in the production of a tangible product, as in farming. We think Congress was well aware of the definitional problems latent in this area and it deliberately chose a broad approach to the meaning of "earned income." [*Tobey v. Commissioner, supra* at 231–232. Fn. refs. omitted.]

In reaching this conclusion, we quoted the following language from the Senate Finance Committee report accompanying section 401(c)(2)(C):

The intent of the Congress in adopting the "earned income" concept was to limit the applicability of these provisions to the portion of a self-employed person's income which was a result of his individual efforts as distinguished from a return on capital. * * * [S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1059, 1103.]

Subsequent to these decisions, the Service reversed its position as to what constitutes earned income under section 911(b), concluding that royalties paid by a publisher for the transfer of property rights of a writer in his products qualifies for earned income treatment under section 911(b). Rev. Rul. 80–254, 1980–2 C.B. 222. Thus, since capital was not a material factor in producing the royalties in the present case, based on our analysis of the statutes and other relevant authority, we find that the royalties in question fit within both definitions of "earned income" under section 1348 of the Code.

Nevertheless, respondent contends that petitioner's income was not earned income because she did not earn it herself. Petitioner, however, argues that, if income is earned income to

Mr. Schulz, it is also earned income to petitioner. In support of her position, petitioner relies primarily on the Ninth Circuit's decision in the case of *Graham v. Commissioner*, 95 F.2d 174 (9th Cir. 1938), revg. and remanding a Memorandum Opinion of this Court. *Graham* involved the question of whether a wife was entitled, on her separate return, to treat one-half of the architect fees earned by her husband as "earned income" within the meaning of section 31(a)(1) of the Revenue Act of 1928, 45 Stat. 804, which provided in pertinent part as follows:

"Earned income" means wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. * * *

The Commissioner conceded that the architect fees in question were community income and that the taxpayer's husband's half of such income was earned income within the meaning of section 31. Nevertheless, the Commissioner asserted that the taxpayer's half of these fees was not "earned income" since the phrase "personal services actually rendered" under section 31 should be construed to mean personal services actually rendered by the taxpayer.

The Ninth Circuit rejected the Commissioner's argument, holding that—

We think that, if Congress had intended such a limitation, it would have expressed that intent. It did, in the same paragraph, where limitations were intended, express such intent by using the words "by him" and "by the taxpayer." No such words were used in the first part of section 31(a)(1). We conclude, therefore, that no limitation was there intended. [*Graham v. Commissioner, supra* at 175.]

Furthermore, the court went on to proclaim that even if earned income were defined as compensation for services actually rendered by the taxpayer, the taxpayer's half of the architect fees in question would still qualify as earned income. In reaching this conclusion, the court reasoned that—

When a married man * * * practices a profession or engages in any gainful occupation or activity, he does so as the agent of a marital community consisting of himself and his wife. * * * He cannot do so in any other way or in any other capacity. Services rendered by him are actually rendered by the community, that is to say, by him and his wife, equally. * * *

That petitioner did not personally participate in the professional labors of her husband is immaterial. One may actually render a personal service without personally performing the acts constituting the service. Otherwise a partnership acting through one of its members, or a principal acting throught [sic] an agent, could not actually render a personal service, the truth being, of course, that such services can be and, in countless instances, are actually so rendered. [*Graham v. Commissioner, supra* at 176. Citation omitted.]

The language of the relevant portions of the applicable statute in *Graham* was identical with that of section 911(b) at all relevant times in the instant case. Thus, *Graham* provides clear authority for petitioner's contention that the community income she received pursuant to the marriage settlement agreement constituted earned income under section 911(b).

This Court has relied on the *Graham* case in several decisions. In *Zaffaroni v. Commissioner*, 65 T.C. 982 (1976), and *Rosenkranz v. Commissioner*, 65 T.C..993 (1976), we held that a nonresident alien wife's community share of both salary and capital gains realized from U.S. sources through the efforts of her husband, a nonresident alien engaged in a trade or business in this country, were taxable to her under section 871(c). In reaching the decision in *Zaffaroni* we stated—

When the husband, through his labor or management of the community property, earns income, either as a salary or as gain from the sale of stock, as in this case, he does so as agent or manager of the conjugal partnership, referred to as the community. The husband does not acquire ownership of the income. Ownership is in the community from the time of acquisition, and he holds title thereto not for himself but as the agent of the community * * *

\* \* \* \* \* \* \*

In the instant case, the fact that [the wife] did not personally render the services in the United States and, in fact, was not physically present in this country during the taxable years does not render section 871(c) inapplicable. * * * [*Zaffaroni v. Commissioner, supra* at 990–991.]

Similarly, in our decision in *Rosenkranz* we stated—

The community income so earned is as much the property of one spouse as the other, and it retains its character as the product of the services of the agent of the community in this country when attributed to the other spouse for Federal tax purposes. * * * [*Rosenkranz v. Commissioner, supra* at 1000.]

Indeed, even the Internal Revenue Service cited *Graham* with approval in Rev. Rul. 59–159, 1959–1 C.B. 26, 28, where it stated—

While community property laws cause income constituting community property to be "received" one-half by each spouse, such laws do not change the nature or character of the income. The character of community income is established by the circumstances under which it is obtained. * * * For example, one-half of the income earned by one spouse· in a community property state is "earned income" of the other spouse for purposes of sections 37(b) and (d)(2) of the Code.

However, despite the clear impact of *Graham* and the subsequently decided cases and rulings, respondent argues that such authorities should not control the instant case because (1) even if section 911(b) under *Graham* could apply to the income in question, section 401(c)(2)(C), the specific statute, overrides section 911(b); and (2) granting petitioner the benefits of section 1348 would provide taxpayers in community property States with preferential treatment over taxpayers in separate property States. We will address each of respondent's contentions individually.

With respect to respondent's first contention, he argues that, since the income in question arose from the transfer of property created by artistic effort, petitioner is bound by the restrictions of section 401(c)(2)(C), which specifically provides that only gain from property created by the taxpayer is earned income. Therefore, respondent asserts that the income received by petitioner was not earned income since she did not create the property from which the income was derived.

Although it is a basic principle of statutory construction that when two statutory provisions could apply, the specific controls over the general provision (*HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981)), we find that principle inapplicable to the instant case. In enacting section 1348(b), Congress specifically provided that "the term 'earned income' means any income which is earned income within the meaning of section 401(c)(2)(C) *or* section 911(b)." (Emphasis added.) Thus, to qualify for preferential treatment under section 1348, income need not be earned income under both section 401(c)(2)(C) and section 911(b), just either of the two. Accepting respondent's contention that section 401(c)(2)(C) overrides section 911(b) would require us to read the words "section 401(c)(2)(C) or section 911(b)" as if they meant "section 401(c)(2)(C) and section 911(b)." Such a construction would be tantamount to this Court's acting as a legislative body which

we decline to do. We therefore find respondent's argument that section 401(c)(2)(C) overrides section 911(b) unpersuasive.

Finally, we direct our attention to respondent's assertion that granting petitioner the benefits of section 1348 would provide taxpayers in community property States with preferential treatment over taxpayers in separate property States. In support of this contention, respondent argues that, if petitioner's income falls within the definition of "earned income" under section 401(c)(2)(C), then spouses in community property States would be entitled to participate in a Keough plan, thus doubling their allowable contributions under section 404(e)(1) over married couples similarly situated in separate property States.

Respondent is correct in his contention that we have always attempted "to interpret the various statutory provisions in such manner as to produce uniformity of treatment of spouses throughout the country, whether they reside in community property States or elsewhere." *Ebberts v. Commissioner*, 51 T.C. 49, 53 (1968). However, he fails to recognize that in the instant case, a finding that a nonworking spouse's share of community income does not constitute earned income for purposes of section 1348 would create totally unwarranted discrimination against couples residing in community property States. For if a nonworking spouse's share of community income is not considered earned income for purposes of section 1348, then married taxpayers in community property States would only be entitled to treat one-half of their community income earned from one spouse's services as earned income. This treatment would create obvious discrimination since one-half of a married couple's salaries in a community property State would be subject to tax at a rate of up to 70 percent, while the entire salaries of married couples in separate property States would be subject to tax on such income at a rate of no higher than 50 percent. Thus, respondent's argument that we should interpret the statutory provisions of the Code in such a manner as to avoid discrimination between community property States and separate property States dictates a finding that petitioner's share of the community income in question constitutes earned income under section 1348.

In reaching this conclusion, we note that our finding is based on the fact that petitioner's share of the community income she received pursuant to the marriage settlement agreement constituted earned income within the definition of section 911(b). As alluded to earlier, section 1348 was worded in the alternative; therefore, although we agree that the income in question may not be earned income under section 401(c)(2)(C) because of the phrase "of his efforts," we need not reach that decision. Accordingly, we find the Keough plan example offered by respondent irrelevant to our decision in the instant case.

In conclusion, we hold that the income received by petitioner under the marriage settlement agreement constituted earned income, thereby entitling her to the benefits of section 1348 during the tax years in issue.

*Decision will be entered under Rule 155.*