[S. F. Nos. 18625, 18626.   In Bank.   June 29, 1954.]

PARR-RICHMOND INDUSTRIAL CORPORATION (a Corporation), Respondent, v. S. S. BOYD, as County Tax Collector, etc., et al., Appellants.

Francis W. Collins, District Attorney (Contra Costa), Charles L. Hemmings, Deputy District Attorney, Thomas M. Carlson, City Attorney (Richmond), and Frederick Bold, Jr., Special Assistant to City Attorney, for Appellants.

Bronson, Bronson & McKinnon and John F. Ward for Respondent.

SPENCE, J.—Plaintiff brought two actions to recover taxes paid under protest on certain property in Richmond for the tax years 1948-1949 and 1949-1950. (Rev. & Tax. Codes, §§ 5136-5143.) The cases were consolidated for trial, and it was stipulated that evidence would be produced only in the first case and that the judgment therein would govern the second case. The tax assessments by the county of Contra Costa and the city of Richmond followed the same pattern, the levy in each instance resting on the premise that title to the real property was vested in plaintiff on the first Monday in March of both years. Plaintiff, on the other hand, has consistently claimed that all it had on the respective tax dates was, as the trial court found, "a qualified and contingent possessory interest in the form of a gratuitous and revocable right to possession"; that the assessment should have been made only against such possessory right, and not as if it held the whole beneficial interest. In line with plaintiff's admitted tax liability on its possessory interest in the property, respective judgments were entered against the county and the city reflecting the offset between the taxes paid by plaintiff under protest and the amounts assessable because of plaintiff's limited possessory right. From such judgments defendants appeal.

As grounds for reversal, defendants argue these points: (1) plaintiff's failure to seek relief from the board of equalization on the alleged improper assessments as preliminary to judicial review; (2) plaintiff's possession of equitable title in the property on the respective dates as justifying its liability for the full fee tax assessments; and (3) plaintiff's adjusted tax liability as a matter referable to the taxing authorities for determination in new assessment proceedings rather than subject to computation by the trial court in effecting an equitable offset. In the light of the record and applicable legal principles, defendants' objections are not well taken.

The property involved is known as Parcels 2 and 5 of the

Richmond Shipyards, consisting of about 115 acres improved with various buildings, wharves, shipways, and other structures used as part of a government shipyard during World War II. At the end of the war this property was placed under the control of the War Assets Administration for disposal as surplus property, and that agency on August 15, 1947, listed it with other property for sale and invited bids. The invitation required the bidder to declare the purpose for which he intended to use the property and stated that title would be conveyed by quitclaim deed without warranty, express or implied. It also provided that the successful bidder shall ''assume responsibility for and agree to pay his share, prorated from . . . [the date of assumption of possession or the delivery of the formal instruments of conveyance], of all general and special real and personal property taxes which may have been or may be assessed thereon.'' It further stipulated that a minimum of 20 per cent of the purchase price should constitute the down payment; that the successful bidder could not make any sale or lease of the property for three years after the ''date of conveyance'' without the government's consent; and that the invitation and bid under it should constitute the agreement between the parties, to be succeeded only by the formal instruments of transfer.

On August 15, 1947, Parr-Richmond Terminal Corporation, an affiliate of plaintiff, submitted conditional bids for both parcels, separately stating the amounts offered for the realty and the personal property thereon. Inasmuch as the tax issue here relates wholly to the realty ownership, only the bids relating thereto need be noted—$320,000 for Parcel 2 and $125,000 for Parcel 5. One condition was that each parcel should be treated ''as a unit as to lands and buildings and personal property.'' Another condition (Rider D) specified: ''This bid is also subject to the ability of bidder to procure a policy of title insurance in its name or in the name of its nominee . . . as of the date of the completion of this transaction, in the event of acceptance hereof, showing good and merchantable title to said property free and clear of any lien or encumbrance which would substantially affect its value.'' Before bidding Parr had learned from a preliminary title report that the title was not then merchantable. It was also stipulated that the three-year restriction on sale or lease of the property, as stated in the invitation to bid, *supra,* would have to be waived or removed (Rider A).

The bids were rejected, not because of the conditions attached thereto but solely because the prices offered were not acceptable. The government made a counterproposal of higher amounts, and after further negotiations the parties agreed on $500,000 for both parcels. The government's approval of the original bids, amended only as to the stated price, was expressed in its letter of September 23, 1947, and Parr indicated acceptance by signing a copy of the latter.

On January 21, 1948, the government's formal acceptance was communicated to Parr in a so-called "letter of intent," stating that "under date of September 23, 1947, the War Assets Administration approved the sale to the Parr-Richmond Industrial Corporation of Parcels Nos. 2 and 5 . . . together with certain buildings, improvements, and personal property . . . in accordance with the terms and conditions of your offer of August 15, 1947, as amended. . . . The quitclaim deed as prepared will convey title as of 12:01 a. m. September 23, 1947." This letter gave "consent to the Parr-Richmond Industrial Corporation and/or the Parr-Richmond Terminal Company, as the case may be, to enter upon and use the land, buildings, improvements, and personal property, the title to which is being conveyed to you as of 12:01 a. m. September 23, 1947, for its account . . ." and also "the immediate right to resell or lease, subject to the terms and conditions as specified in your offer of August 15, 1947, any or all of the land, buildings, improvements and/or personal property located on Parcels 2 and 5 without prior authorization from the War Assets Administration." The letter also provided for the escrowing of the down payment: "Your company, in accepting this Letter of Intent, agrees, prior to entering into possession, to deposit with the . . . Title Company . . . the agreed upon initial payment of . . . $122,412.42 . . ." On January 30, 1948, Parr delivered a check in the stated amount to the title company, accompanied by a letter of instructions reading in part as follows: ". . . whichever corporation does take title, you are authorized to deliver to the War Assets Administration the sum of . . . $122,412.42 . . . upon their depositing with you a Quitclaim Deed duly executed by said War Assets Administration, which will vest merchantable title in favor of either Parr-Richmond Industrial Corporation or Parr-Richmond Terminal Company as such determination shall be made. . . . Upon receipt of this letter and the check enclosed herewith

. . . will you please acknowledge receipt of same upon the copy enclosed herewith so that we may in turn hand it to the War Assets Administration as evidence of the fact that this money has been deposited with you in the above-numbered escrows.''

On January 31, 1948, Parr acknowledged and accepted the ''letter of intent.'' During that same month Parr had taken possession of both parcels in accord with the letter's authorization, and on the first Monday in March of both 1948 and 1949 held possession thereunder. It was not until June 1, 1949, that title passed pursuant to two quitclaim deeds executed as of that date, acknowledged and delivered by ''the United States of America, acting by and through War Assets Administration,'' to plaintiff as grantee—one deed for each parcel. Each deed concluded with the statement, ''This Quitclaim Deed, executed this 1st day of June, 1949, shall be considered effective as of the day and year first hereinabove written,'' which was June 1, 1949—the date the government actually conveyed title, not September 23, 1947, as recited in the ''letter of intent.'' The title company thereupon delivered to the government two deeds of trust dated and acknowledged on June 1, 1949—one for each parcel—securing the balance of the purchase price. Thus the down payment was in escrow from January 30, 1948, to June 1, 1949— 16 months.

As above noted, the government's invitation to bid required each bidder to specify the purposes for which he intended to use the property. The Parr bids stated that its purpose was development of the property as an industrial area, bringing in new industries by long-term leases and by sale. These declarations, plus Parr's insistence on the removal of the three-year restrictions against sales and leases, make it clear that a merchantable title was an indispensable requisite of Parr's intended purchase. To that point the trial court found that ''plaintiff's bid contemplated the long-term lease or sale of part or all of said realty to industrial firms desiring to locate in the city of Richmond, and . . . that purpose could not be achieved unless and until plaintiff could obtain a merchantable title to said realty; Rider D of plaintiff's bid recited the express condition of merchantable title, and went to the essence of plaintiff's conditional bid and the conditional agreement subsequently entered into between the U.S.A. and plaintiff.''

The trial court found also that under the ''letter of intent''

Parr agreed to purchase the property if, as and when the government could convey a good and merchantable title, and that the government agreed on its part to convey such title if, as and when it could do so; further, that during all of the year 1948 the "contemplated sale or conveyance was wholly executory, and at all of said times there were clouds, encumbrances and adverse claims upon the title to said realty which adversely affected said title to a substantial degree, and which rendered said title unmerchantable." The trial court further found that on the first Monday in March, 1948, there was uncertainty as to whether the government "would be able to convey . . . [a] good and merchantable title" and if so, when, and that on that date Parr's "only interest, right or title" to the property "was a qualified and contingent possessory interest in the form of a gratuitous and revocable right to possession, the reasonable duration of" which was found to be a "period of one year."

The trial court further found that "As of the first Monday of March, 1948, for the tax year 1948-1949, defendant county . . . assessed all of said realty against plaintiff in the same manner and with the same effect as though plaintiff were the owner in fee of said realty with full beneficial ownership and use thereof. Said realty was . . . assessed . . . [at] $229,090.00 for real estate, and $335,000.00 for improvements, together with an assessment of $25,500 for certain personal property then situated on said realty; said assessment . . . was . . . charged to plaintiff upon the assessment roll of the county as an assessment against real estate, improvements, and personal property, and not as an assessment against plaintiff's said possessory interest. In said assessment defendant county . . . did not segregate the plaintiff's qualified and contingent possessory interest in said realty from the fee ownership of the United States, and did not assess said possessory interest to plaintiff, but instead erroneously assessed the entire fee ownership of said realty to plaintiff; a proper segregation of plaintiff's qualified and contingent possessory interest in said realty and a proper assessment of said interest . . . would have resulted in an assessed value . . . of $71,581.00. . . ." The trial court also found and concluded that the assessments when made by both county and city were illegal and void for the reason that the United States was the owner in fee of the property taxed against Parr, and that Parr's possessory interest had not been assessed at all.

The trial court concluded that under the terms of the conditional agreement "plaintiff was not obligated to purchase said realty unless and until said condition [good and merchantable title] was met, and unless said condition was met within a reasonable time plaintiff was not obligated to purchase said realty, and the U.S.A. was not obligated to sell said realty in any event, and said conditional agreement would terminate; said conditional agreement did not effect an equitable conversion as to said realty on the first Monday in March, 1948, or at any time during the tax year 1948-1949, and at no time prior to or during said tax year was plaintiff the legal or equitable owner of said realty by virtue of said conditional agreement or otherwise."

The trial court deducted the taxes which it found Parr should have paid on its possessory interest from the amount paid under protest and entered judgment for the difference against the respective county and city defendants. Defendants attack this judgment on both procedural and substantive grounds.

Defendants first claim that plaintiff's protest of tax assessments raises a question of valuation which should have been presented to the board of equalization before a judicial review was sought. (Rev. & Tax. Code, § 1607.) Plaintiff alleged that in July of each of the two tax years it filed "a duly verified petition for cancellation of erroneous and illegal assessments and for reduction in assessments" with the respective board of supervisors and the city council, each sitting as a board of equalization, and that the petitions were denied. Copies attached to the complaint show that the ground of plaintiff's protest was not a claim of overvaluation of an owner's property calling for "a reduction in an assessment on the local roll" (Rev. & Tax. Code, § 1607), but rather was a claim of illegality against the assessments *in toto* as based on an erroneous ownership—the fee interest in Parr, not its revocable possessory interest in the property, a separate taxable item which was not recognized and assessed at all. During the trial plaintiff stipulated that the allegations of "demand and refusal" of relief by the respective boards of equalization were "set up as a part of the background" but "are in no way essential to plaintiff's cause of action and . . . may be stricken as surplusage."

Plaintiff is correct in its distinction as to the necessity for recourse to the board of equalization prior to resort to the court. ▆▆▆ Where the owner of property rights claims that

the tax assessment overvalued what he owned, he may not attack the determination of a board of equalization in court unless he has fully and fairly presented the question of the value of his property to the board. (*Los Angeles Gas & Elec. Co.* v. *County of Los Angeles,* 162 Cal. 164, 168-169 [121 P. 384, 9 A.L.R. 1277]; *Hammond Lbr. Co.* v. *County of Los Angeles,* 104 Cal.App. 235, 241 [285 P. 896]; *Eastern-Columbia, Inc.* v. *County of Los Angeles,* 61 Cal.App.2d 734, 745 [143 P.2d 992].) ■ But where the taxpayer attacks the assessment as void because he does not own the property on which the tax demand was made, there is no question of valuation which must be presented first to the board of equalization for correction as a condition for judicial relief. (24 Cal.Jur., § 283, p. 313; *Brenner* v. *Los Angeles,* 160 Cal. 72, 76 [116 P. 397].) As was said in *Associated Oil Co.* v. *County of Orange,* 4 Cal.App.2d 5, at page 9 [40 P.2d 887]: "While in one sense it is true that almost any mistake which results in an excessive assessment amounts to an overvaluation of the property of a taxpayer, we think there is a real and distinct difference between those cases in which it may properly be said that the error is one of overvaluation and those cases in which the overvaluation is a mere incidental result of an erroneous assessment of property which should not have been assessed." ■ So here plaintiff's theory of relief—from an illegal tax because it was levied against a greater property interest than it allegedly owned, the whole ownership interest, and not against its limited possessory interest for which plaintiff admitted liability—did not require its prior application to the board of equalization before recourse to the court. (See *United States* v. *Allegheny County,* 322 U.S. 174, 187 [64 S.Ct. 908, 88 L.Ed. 1209]; *Gottstein* v. *Adams,* 202 Cal. 581, 584-585 [262 P. 314]; *Los Angeles* v. *Board of Supervisors,* 108 Cal.App. 655, 664-665 [292 P. 539].)

There now remains the principal issue of whether the challenged tax assessments may be supported under the doctrine of equitable conversion. Defendants contend that while the government may have held legal title to the property, plaintiff held equitable title under an executory contract of sale, an interest assessable on the basis of the full value as "real property" (Rev. & Tax. Code, § 104), rather than a mere segregable "possessory interest" (Rev. & Tax. Code, § 107). ■ The doctrine of equitable conversion "is a mere fiction resting upon the principle that equity regards things which

are directed to be done as having actually been performed where nothing has intervened which ought to prevent such a performance." (19 Am.Jur., § 2, p. 2.) ■ An unconditional contract for the sale of land, of which specific performance would be decreed, grants the purchaser equitable title, and equity considers him the owner. (1 Tiffany on Real Property [3d ed.], § 307, p. 528; 2 Pomeroy's Equity Jurisprudence [5th ed.], § 372, p. 33; *Estate of Dwyer,* 159 Cal. 664, 675 [115 P. 235].) ■ But there is no equitable conversion where the contracting parties demonstrate an intention to the contrary. (19 Am.Jur., § 4, p. 4; *Estate of Pforr,* 144 Cal. 121, 128 [77 P. 825]; *Estate of Gracey,* 200 Cal. 482, 488-489 [253 P. 921]; *McCaughna* v. *Bilhorn,* 10 Cal.App.2d 674, 678-679 [52 P.2d 1025].)

■ The trial court resolved the question of the vesting of equitable title by holding that "at no time prior to or during said tax year was plaintiff the legal or equitable owner. . . ." The record clearly supports that conclusion: (a) Parr knew before it bid that a variety of matters—including uncompleted proceedings in eminent domain—rendered the title unmerchantable; (b) the government accepted the conditional bid which called for a merchantable title; (c) the escrow provisions in the "letter of intent" were tacit admissions by the government that it needed time to make the title good; and (d) the 16-month delay before execution of the quitclaim deeds accentuated the time consideration required for the removal of all clouds and encumbrances on the title. Defendants argue that the government's letter of September 23, 1947, which was accepted by Parr in conclusion of the parties' negotiations as to the price to be paid for the property, constituted their contract. That letter made no reference to Parr's offer and its conditions as to merchantable title. However, it was followed by the government's formal acceptance in the "letter of intent," and the trial court properly concluded that this latter document, later in point of time—January 21, 1948—and incorporating the government's invitation for bids along with the terms of Parr's conditional bids, constituted the conditional agreement between the parties. The "letter of intent" contained the escrow provisions above quoted, which thereby became part of the parties' contract. Any doubt as to the parties' intentions was settled by the recital in both quitclaim deeds that they became effective as of their date, which was June 1, 1949. As so executed, the deeds themselves super-

seded and nullified the provisions in the earlier writing to the effect that title would be conveyed "as of 12:01 a. m. September 23, 1947," and made it clear that title vested on June 1, 1949, and not before.

Defendants rely on *S.R.A., Inc.* v. *State of Minnesota,* 327 U.S. 558 [66 S.Ct. 749, 90 L.Ed. 851], but the facts found by the trial court and above discussed clearly distinguish the present situation. The two cases have one point in common, in that the property in both instances was surplus real estate, the legal title to which was vested in the United States. However, there are several points of difference which are material: (1) In the S.R.A. case the contract was the normal vendor-vendee contract, where the government retained legal title only as security for the balance of the purchase price and "in substance [was] in the position of a mortgagee." (P. 565.) Here the vendor-vendee contract, as modified in writing by the escrow instructions, provided for the transfer of title only if and when the government could convey a merchantable title, pending which uncertain event the down payment itself was held in escrow. The government was retaining title not for security but during the time allowed for its agreed performance, and then appropriate deeds were to be executed, and notes, secured by deeds of trust, were to be and were given for the balance of the purchase price. (2) Here the whole transaction centered on acquisition of a merchantable title, a matter not at all involved in the S.R.A. case, where "[a]ll obligations due under the contract had been met." (P. 560.) (3) In the S.R.A. case the buyer was "in possession . . . under a contract of sale with uncompleted conditions for execution and delivery of the muniments of title" when the purchase price was paid in full (p. 561), while here the buyer occupied the property under what the trial court found to be "a gratuitous and revocable right to possession" granted by the "letter of intent," an arrangement covering the interval for clearing a good and merchantable title, at which time the muniments of title were to be delivered out of escrow and deeds of trust given back. (4) During that interval Parr did not occupy the status of a normal vendee as in the S.R.A. case, where the vendee had made the down payment and nothing remained to be done by the parties except payment of the balance of the purchase price and execution of the formal conveyance. Here the fact that Parr was not in the position of the conventional vendee during the 16-month escrow period but

was waiting to see if it was to get *any* title, alone serves to distinguish this case from the ordinary vendor-vendee situation where, as plaintiff agrees, the vendee holding equitable title is taxable as if vested with full legal title. Accordingly, in the S.R.A. case the State of Minnesota had the power to tax the property within its borders, though the legal title remained in the United States but simply for security purposes under the unconditional contract between the parties.

As between the vendor and vendee, real estate is ordinarily taxable to the vendor where the sale is conditional. (2 Cooley on Taxation [4th ed.], § 603, p. 1274.) The fact that the contract of sale may have specifically provided that the purchaser should pay the taxes is immaterial; the vendor remains liable where the sale is not absolute, for property must be assessed to the owner. (*Robertson* v. *Puffer Mfg. Co.*, 112 Miss. 890 [73 So. 804, 805].) For the doctrine of equitable conversion to apply in measure of tax liability, there must be "a contract for the sale and purchase of the land which is specifically enforceable at the time the rights of the parties are fixed." (McClintock on Equity, § 102, p. 182; see also *Estate of Dwyer, supra,* 159 Cal. 664, 675.) Thus, "[i]f the vendor did not have at that time the title which he contracted to convey, there is no conversion." (McClintock on Equity, § 106, pp. 182-183; see also *Amundson* v. *Severson,* 41 S.D. 377 [170 N.W. 633, 634].)

Here the contract bound Parr to purchase the property if the government within a reasonable time conveyed a merchantable title. At the time of the contract's execution the government did not have such a title. It was bound, however, to exercise reasonable diligence in clearing the title. But not then having that which it contracted to convey, the government had no right to specific performance at that time. Therefore there was no equitable conversion to support the tax assessments against plaintiff, and its protest thereof must be sustained.

Defendants finally contend that the trial court erred in itself determining plaintiff's tax liability rather than remanding the matter to the tax authorities for appropriate assessment proceedings. Plaintiff has conceded throughout this litigation that its possessory interest was taxable (Rev. & Tax. Code, § 107), and therefore that it would be "inequitable" for it "to seek to recover taxes which in equity it should pay." In such cases the rule applies that recovery should be limited to the difference between the tax paid and

that which properly should have been paid (*DeFremery* v. *Austin,* 53 Cal. 380, 382-383), and that rule was followed here.

In determining the tax on plaintiff's possessory interest the trial court followed the formula similarly used in *Kaiser* v. *Reid,* 30 Cal.2d 610, which was a valuation method theretofore judicially approved in cases presenting analogous considerations affecting possessory rights. (*Blinn Lbr. Co.* v. *County of Los Angeles,* 216 Cal. 474, 478-479 [14 P.2d 512, 84 A.L.R. 1304] ; *Hammond Lbr. Co.* v. *County of Los Angeles, supra,* 104 Cal.App. 235, 244-245.) The tax as so computed was then deducted from the amount of tax claimed by defendants, and the judgments herein were entered for the difference. ▮▮▮ In the trial court defendants made no objection to the mathematical accuracy of the computation of the formula's application if Parr had only a possessory interest in the property, but they adhered to the correctness of the challenged tax assessments based on plaintiff's equitable title to the property for the respective tax years. The trial court had authority here to so proceed in effecting an equitable adjustment on the tax assessments and to enter judgments accordingly. (Rev. & Tax. Code, § 5141.) Under these circumstances, defendants are in no position now to challenge the correctness of the trial court's finding of what was actually due from plaintiff based on the approved valuation formula for possessory interests.

The judgments are affirmed.

Shenk, Acting C. J., Edmonds, J., Traynor, J., Schauer, J., and Peek, J. pro tem.,* concurred.

CARTER, J.—I dissent.

It appears that the plaintiff taxpayer should have first pursued his remedy before the board of supervisors sitting as a local board of equalization before court action and in such action the court is limited to a review of the evidence before the board.

The factual situation should first be clarified. The majority opinion indicates that this is a case where taxes were assessed against property plaintiff did not own. That is not the case. Taxes on real property are not assessed against a person. They are assessed against the property. Property may be

---

*Assigned by Chairman of Judicial Council.

assessed to an unknown owner. (Rev. & Tax. Code, § 611.) "A mistake in the name of the owner of real estate does not render invalid an assessment or any tax sale." (Rev. & Tax. Code, § 613.) In the case at bar while the entire interest in the property was assessed to plaintiff as owner it was assessed against the property and it is conceded that plaintiff has an interest in the property albeit it is only a possessory interest. The only question is, therefore, whether too great a value was placed on that interest. It is not a case of assessing a tax on exempt property or property in which plaintiff had no interest. He owned a possessory interest and that was assessed and is taxable. In *Fall* v. *Mayor of Marysville,* 19 Cal. 391, the tax was against a bridge, a reversionary interest in which was owned by the city, but which the taxpayer had the right to use. The court said (at p. 393): "There is no doubt, therefore, that the plaintiff has a taxable estate in the property, and so far as his right to maintain this suit is concerned, *it is immaterial that the property has been assessed at its full value. The objection on that ground does not go to the validity of the tax, but to its amount,* and an application for its reduction was the only remedy. The property was not taxable beyond his interest in it, and in legal effect, the tax upon it amounted to nothing more than a tax upon his interest." (Emphasis added.) In *S. & G. Gump Co.* v. *San Francisco,* 18 Cal.2d 129 [114 P.2d 346, 135 A.L.R. 595], it was held that where property was assessed to a bailee as owner when he merely had a possessory right, he could not recover taxes paid under protest where he had not applied to the local board of equalization for a modification of the assessment and show who was the owner of the property. The court cited for its holding, *Title Guaranty & Trust Co.* v. *Los Angeles,* 3 Cal.App. 619 [86 P. 844], where property was assessed to an agent who held possession for the owner and the court said (p. 621): "Nor are we prepared to hold that, under the circumstances, the failure of the assessor to designate the plaintiff's principals or beneficiaries was sufficient to invalidate the assessment. It had the opportunity of correcting the defect, if in any way harmful to it, by application to the assessor while the assessment-roll was still under his control, or afterward by application to the board of equalization, which had power to correct the plaintiff's assessment, either by adding the names of the parties ultimately liable, or by transferring the whole amount taxed to the assessments of the several

parties interested in the fund." (See also *S. W. Straus & Co.* v. *Los Angeles County,* 128 Cal.App. 386 [17 P.2d 757].)

The general rule with regard to the necessity for first applying to the board of supervisors as a board of equalization is stated in *Security-First Nat. Bank* v. *County of Los Angeles,* 35 Cal.2d 319, 320 [217 P.2d 946]: "It is the general rule that a taxpayer seeking judicial relief from an erroneous assessment must have exhausted his remedies before the administrative body empowered initially to correct the error. . . . An exception is made when the attempted assessment is a nullity because the property is either tax exempt or outside the jurisdiction. . . . But resort to the board of equalization is not rendered unnecessary by the fact that, as in the present case, the error is one in the classification of property . . . and the tax is assailed as being discriminatory in violation of constitutional mandates. . . .

"Plaintiff contends, however, that its bank vault doors and counterlines were 'exempt' from taxation under constitutional principles, and that consequently prior application to the board of equalization was not a prerequisite to the maintenance of this action. The contention cannot be sustained. The vault doors and counterlines admittedly were located within the county, city and district in which they were assessed. Clearly, they were property of a nature taxable by defendants. . . . The fact that similar property of others had been systematically misclassified as personalty and therefore relieved of the burden of special assessment district taxes would ordinarily require that plaintiff also be excused from paying such taxes. . . . It does not follow, however, that plaintiff's vault doors and counterlines were tax exempt as claimed. A somewhat similar problem was presented in *Los Angeles etc. Corp.* v. *Los Angeles County,* 22 Cal.App.2d 418 [71 P.2d 282]. That case involved the assessment of a leasehold interest in tidelands owned by the city. *Plaintiff contended that since the leasehold had no taxable value, the tax was one on nonexistent property and resort to the board of equalization was not necessary.* In rejecting that contention, the court there said, at pp. 423-424: 'But it does not follow that if the property belongs to a class which is subject to taxation it is nonexistent property because under the peculiar circumstances existing it is without taxable value. . . .' " (Emphasis added.) The same rule is stated in *Bank of America* v. *Mundo,* 37 Cal.2d 1 [229 P.2d 345]. Similarly

in the instant case the property was taxable. At least plaintiff's conceded possessory interest was taxable, and the question is not whether it was exempt property or outside the taxing jurisdiction.

There is no tenable distinction between this case and the rules set forth in the Security Bank case. The cases relied upon by the majority do not support the statement that resort need not be had to the local board of equalization where the person who is named as owner of the property assessed is not the owner. In *Brenner* v. *Los Angeles,* 160 Cal. 72 [116 P. 397], the claim was that all of the property against which the assessment was made was exempt from taxation. In *Associated Oil Co.* v. *County of Orange,* 4 Cal. App.2d 5 [40 P.2d 887], the assessment was on nonexistent property and the holding is doubtful in view of the Security Bank case. In *Gottstein* v. *Adams,* 202 Cal. 581 [262 P. 314], and *Los Angeles* v. *Board of Supervisors,* 108 Cal.App. 655 [292 P. 539], there was no question of exhausting the administrative remedy.

In any event it would appear that the matter should have been remanded to the local board of equalization to ascertain the value of the possessory interest and reduce the assessment accordingly, because it is that board, rather than a court, which has jurisdiction over valuation questions. (*Universal Consol. Oil Co.* v. *Byram,* 25 Cal.2d 353 [153 P.2d 746]; *La Grange etc. Co.* v. *Carter,* 142 Cal. 560 [76 P. 241]; *Los Angeles etc. Co.* v. *County of Los Angeles,* 162 Cal. 164 [121 P. 384, 9 A.L.R. 1277].)

I would therefore reverse the judgment.