ESTATE OF JOSEPH M. CARLI, DECEASED, ROBERT J. CARLI, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21753–81.    Filed April 9, 1985.

*Alexander F. Eagle III*, for the petitioner.

*Rebecca T. Hill, Eugene H. Ciranni*, and *Dan Henry Lee*, for the respondent.

JACOBS, *Judge:*\* By statutory notice of deficiency, respondent determined a deficiency in estate tax in the amount of $7,424. In his amended answer to the petition, respondent claimed a $4,026 increased deficiency; thus, the total amount of estate tax in dispute is $11,450.

Due to concession[1] by petitioner, the issues for decision are:

(1) Whether the value of the decedent's residence, which the decedent transferred to a revocable trust, should be reduced to reflect the surviving spouse's right to a life estate in the residence under an antenuptial agreement.

---

\*By order of the Chief Judge, this case was reassigned from Judge Edna G. Parker to Judge Julian I. Jacobs for disposition.

[1]Part of the deficiency determined by respondent in the statutory notice, and conceded by petitioner, arose from an adjustment to correct the balances of certain bank accounts included in the gross estate. In reporting these accounts on the estate tax return as taxable transfers under sec. 2035(a), I.R.C. 1954, petitioner erroneously excluded from the account balances the value of the $3,000 annual gift exclusion. Cf. sec. 702(f), Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2930.

(2) Whether the surviving spouse's right to a life estate under the antenuptial agreement is a claim deductible under section 2053.[2]

## FINDINGS OF FACT

The facts have been fully stipulated and are so found. The stipulation, together with joint exhibits, is incorporated herein by this reference and form the basis of the Court's findings of fact.

The decedent, Joseph M. Carli, was born in Italy in 1898 and resided in California from 1899 until his death on December 26, 1977. The decedent died of cancer, with which he had been afflicted since 1969.

The decedent's son, Robert J. Carli (Robert), filed this petition in his capacity as the executor of the decedent's estate. At the time he filed the petition, Robert resided in Santa Clara, California.

A Federal estate tax return was timely filed for the decedent's estate with the Internal Revenue Service Center in Fresno, California, reporting a gross estate of $187,906.

On August 3, 1972, the decedent created a revocable trust, reserving a life estate unto himself. Upon the death of the decedent, the trust estate was to be divided into two trusts, one for the benefit of Robert and the other for the benefit of Robert's children. The decedent transferred to the trust his residence at 1481 Cromwell Drive, Santa Clara, California (the Cromwell residence), by a quitclaim deed, dated August 21, 1972.

On the same day that the trust was created, the decedent executed a will in which he bequeathed all his tangible personal property to Robert and directed that the residue of his estate be added to the corpus of the trust.

On June 21, 1974, in anticipation of marriage, the decedent, then age 75, and Jennie Margaret Downey Whitlatch (Jennie), then age 73, entered into an antenuptial agreement. Pursuant to the antenuptial agreement, each party waived all rights that either would otherwise acquire in the other's property by

---

[2]All statutory references are to the Internal Revenue Code of 1954 as in effect at the date of decedent's death, and all Rule references are to the Rules of Practice and Procedure of the Tax Court, except as otherwise noted.

virtue of their marriage, including any rights that would accrue upon death. The agreement further provided that the parties' separate property, whether acquired before or during the marriage, would remain separate property. The agreement delineated which expenses and obligations were to be considered separate liabilities and which were to be treated as joint obligations, and provided that joint obligations were to be paid from a joint bank account to which each would contribute equally.

The agreement further provided that the decedent and Jennie would reside in the Cromwell residence, and that the decedent would amend his will to provide that, upon the death of the decedent, Jennie would have the right to live in the Cromwell residence for the rest of her life, unless she either remarried or relinquished her life estate in the Cromwell residence. The only consideration received by the decedent for Jennie's life estate in the Cromwell residence was that provided under the antenuptial agreement.

On August 10, 1974, the decedent and Jennie were married. At that time, Jennie, a retired teacher, owned property worth more than $150,000 and had a monthly income of $750, which consisted of a pension and social security benefits. The decedent was employed as an automobile service manager throughout 1974, during which time he earned a salary of $12,414.01. The decedent terminated his employment in February of 1976 for health reasons. After the marriage, the decedent did not revise or amend either his will or the trust agreement as he had agreed.

Following the decedent's death in December of 1977, Jennie continued to live in the Cromwell residence, which then had an appraised value of $89,000. In March of 1978, Jennie entered into a "Mutual Settlement and Release Agreement" with Robert individually and as trustee and executor of the decedent's estate. Under the agreement, she relinquished her life estate in the Cromwell residence for a consideration of $10,000.

The California State Controller valued Jennie's life estate in the Cromwell residence at $31,423 for State inheritance tax purposes.

## OPINION

The decedent's transfer of the Cromwell residence to the revocable trust on August 21, 1972, constituted a transfer described in sections 2036(a) and 2038(a).[3] On the Federal estate tax return, the estate claimed a marital deduction of $31,423 for the actuarial value of Jennie's life estate in the Cromwell residence. Petitioner subsequently abandoned this position, and now contends that the value of the decedent's interest in the Cromwell residence must be reduced by the value of Jennie's life estate therein (which petitioner claims is $31,423). In the notice of deficiency, respondent disallowed the claimed $31,423 marital deduction,[4] but allowed the estate a $10,000 deduction under section 2053(a)(3) for the payment made to Jennie. In his amended answer to the petition, respondent asserts that the allowance of the $10,000 deduction under section 2053(a)(3) was erroneous.

Petitioner's argument is addressed to the value at which the Cromwell residence is to be included in the gross estate under

---

[3]SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

SEC. 2038. REVOCABLE TRANSFERS.

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3-year period ending on the date of the decedent's death.

(2) TRANSFERS ON OR BEFORE JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power during the 3-year period ending on the date of the decedent's death. Except in the case of transfers made after June 22, 1936, no interest of the decedent of which he has made a transfer shall be included in the gross estate under paragraph (1) unless it is includible under this paragraph.

[4]The deduction was disallowed on the ground that the life estate is a terminable interest and therefore nondeductible under sec. 2056(b). Petitioner has conceded in this proceeding that the life estate passing to Jennie does not qualify for the marital deduction.

section 2031.[5] Petitioner maintains that the value of the residence should be discounted or reduced by the value of Jennie's right to a life estate therein under the antenuptial agreement. Petitioner premises his argument on this Court's decision in *Estate of Johnson v. Commissioner*, 77 T.C. 120 (1981), which was reversed on appeal (718 F.2d 1303 (5th Cir. 1983)).

We believe the present case is readily distinguishable from that presented in *Estate of Johnson*. In that case, we held that a surviving spouse's statutory homestead rights in Texas should be treated as a type of restriction or encumbrance that diminished the value at which the decedent's residence was includable in the gross estate. In analyzing the restrictive nature of homestead rights in Texas, the majority noted that the right of life occupancy granted a surviving spouse under the Texas homestead statute was personal to the surviving spouse and therefore distinguishable from a life estate. 77 T.C. at 124 n. 3.

In the present case, the right at issue is not a statutorily created right that attached to the decedent's real property by operation of law, but a right under an antenuptial agreement to a life estate in the marital residence upon the death of the promisor-spouse. Further, Jennie's rights under the agreement did not have the Texas homestead critical features of: (1) Impairment of decedent's ability to convey the property during his life; and (2) exemption of the property from the decedent's creditors either before or after death. We find, therefore, no basis for equating Jennie's rights with the rights at issue in *Estate of Johnson* and accordingly hold that the decision in that case is inapplicable to the present controversy.[6]

Petitioner, in claiming that Jennie's rights under the agreement were a restriction that reduced the fair market value of the Cromwell residence, grafts onto his argument the analysis applicable to the exclusions provided in the parenthetical language of sections 2036(a) and 2038(a) for lifetime transfers

[5]SEC. 2031. DEFINITION OF GROSS ESTATE.

(a) GENERAL.—The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, whatever situated.

[6]We need not decide at this time whether we concur in the Fifth Circuit's reversal in *Estate of Johnson*.

for adequate and full consideration.[7] As we view the record, the decedent never "transferred" the secondary life estate to Jennie by any instrument of conveyance during his life. The decedent only bound himself contractually to devise the secondary life estate to Jennie. He did not, in fact, amend either his will or the trust agreement. We therefore do not find the parenthetical exclusions under sections 2036(a) and 2038(a) to be applicable.

The issue raised in respondent's amended answer, that of the deductibility of Jennie's rights under the antenuptial agreement, is governed by section 2053. Section 2053(a)(3) authorizes an estate tax deduction for claims against an estate. Respondent argues that the deduction allowed under section 2053 in the notice of deficiency for Jennie's right to a life estate was erroneous because, under local law, Jennie had a "claim to an estate" and not a "claim against the estate." Respondent cites in support of his position *In re Robertson's Estate*, 151 Cal. App. 2d 209, 311 P.2d 573 (1957), which respondent interprets as standing for the proposition that "an antenuptial agreement executed after the last will of the decedent serves as a modification of, and therefore part of, the will of the decedent." We disagree.

In the first place, the *Robertson* court expressly stated that the effect of an antenuptial agreement executed after a will is to withdraw from the application of the will the property disposed of under the agreement. 311 P.2d at 578. And while the court noted that the provision in the agreement by which the decedent promised to bequeath the residue of his estate to his spouse "had the same effect as if it were a clause of the will"[8] (311 P.2d at 579), it explicitly held that the disposition of

---

[7]Petitioner neither alleged in the petition nor contended on brief that the doctrine of equitable conversion (which the dissenting opinion herein would apply) applies herein. Since this issue was not properly raised, we need not decide it. Nevertheless, there is some doubt as to whether, under California law, the doctrine of equitable conversion is applicable to a tax controversy. Cf. *Laurel Hill Cemetery Association v. City and Co. of San Francisco*, 81 Cal. App. 2d 371, 184 P.2d 160 (1947).

[8]Part of the controversy in *Robertson* (which was an appeal by the surviving spouse from the probate court's proceeding on the executors' final accounting) centered upon whether the residue of the estate, to which the surviving spouse was entitled under the agreement, was to be subject to debts and administration expenses. The court interpreted the provision of the agreement as "a determination that the properties to which [the surviving spouse] would be entitled *under the agreement* were subject to the charges of administration." 311 P.2d at 579. (Emphasis added.) Thus, as we read the court's opinion, the surviving spouse's rights derived from the agreement and not from the will, and the question to be resolved was the amount due her on her claim, i.e., the gross or net residue.

the residue was not under the residuary clause of the will but under the agreement.

In the second place, we do not believe that such fine points of local law are dispositive of the question herein. As we view the matter, the pivotal question is not whether Jennie received the life estate under the will or under the agreement, but whether the decedent's promise of a life estate was purely gratuitous or whether it was supported by consideration.

The availability of the deduction for claims against an estate is subject to the limitations set forth in section 2053(c)(1). Section 2053(c)(1)(A) provides as follows:

(A) CONSIDERATION FOR CLAIMS.—The deduction allowed by this section in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an *adequate and full consideration in money or money's worth*; except that in any case in which any such claim is founded on a promise or agreement of the decedent to make a contribution or gift to or for the use of any donee described in section 2055 for the purposes specified therein, the deduction for such claims shall not be so limited, but shall be limited to the extent that it would be allowable as a deduction under section 2055 if such promise or agreement constituted a bequest. [Emphasis added].

In determining whether a claim that is founded on an agreement was contracted "for an adequate and full consideration in money or money's worth," section 2053(e) requires that the rule set forth in section 2043(b) must be applied. Section 2043(b) provides that, for the purposes of the estate tax provisions, a consideration "in money or money's worth" does not include an actual or promised relinquishment of "dower or curtesy, or a statutory estate created in lieu of dower or curtesy, or of other marital rights."

Section 804 of the Revenue Act of 1932, 47 Stat. 280, amended section 303(d) of the Revenue Act of 1926, 44 Stat. (Part 2) 73, by adding the language now found in section 2043(b). The purpose of the amendment was to eliminate the estate tax avoidance possible through a contractual conversion of a surviving spouse's statutory rights in the deceased spouse's property into consideration for what would otherwise be a taxable transfer or unallowable deduction:

This amendment excludes, in determining "consideration in money or money's worth," the value of a relinquished, or a promised relinquishment

of, dower, curtesy, or other marital rights in decedent's property. Section 302(a) and (b) of the 1926 Act require the value of such an interest to be included in the gross estate, and, if its value may, in whole or in part, constitute a consideration for an otherwise taxable transfer (as has been held to be so), or an otherwise unallowable deduction from the gross estate, the effect produced amounts to a subversion of the legislative intent expressed in section 802(a) and (b).

For example, a decedent dies leaving an estate of $1,500,000 (after payment of all charges), and under the State law the surviving spouse is entitled to one-third, or $500,000, of which she cannot be deprived by will without her consent. Under existing law the estate is entitled to no deduction on account of her statutory rights, but, if she and decedent had entered into a contract by which she was to receive from his estate a stated sum in consideration of a waiver of her statutory rights, the amount due her under the contract might be held a deductible claim against the estate as having been contracted for an adequate and full consideration in money's worth, namely, the value of her waived marital rights.

[S. Rept. No 665, 72d Cong., 1st Sess. (1932), 1939–1 C.B. (Part 2) 496, 532.]

Given the legislative purpose underlying section 2043(b), this Court has held that the phrase "other marital rights," for the purposes of determining whether a transfer or a claim was made for "consideration in money or money's worth," embraces those rights conferred upon a surviving spouse by local law upon the death of his or her spouse. *Estate of Ellman v. Commissioner*, 59 T.C. 367, 371–375 (1972); *Estate of Rubin v. Commissioner*, 57 T.C. 817, 824 (1972), affd. without published opinion 478 F.2d 1399 (3d Cir. 1973); *Estate of Glen v. Commissioner*, 45 T.C. 323, 340–342 (1966). This definition does not, however, include any rights a spouse may have by virtue of the marriage in the other spouse's property during their joint lives. *Estate of Ellman v. Commissioner, supra; Estate of Rubin v. Commissioner, supra; Estate of Glen v. Commissioner, supra.*

In the present case, the availability of the deduction under section 2053(a)(3) for Jennie's claim depends upon whether or not the decedent received "adequate and full consideration in money or money's worth" in exchange for Jennie's life estate. The parties have stipulated that the only consideration exchanged by Jennie for the life estate in the Cromwell residence was that contained in the antenuptial agreement. Because the antenuptial agreement for the most part consists of reciprocal waivers of the rights either party would otherwise have had upon the death of the other (i.e., "marital rights" that do not

constitute "consideration in money or money's worth" under section 2043(b)), we need only consider two of the provisions here.

The first of these is Jennie's waiver of her right to support. As respondent points out in his brief, a provision in an antenuptial agreement that purports to relieve or modify the support obligation imposed upon a spouse by law is generally considered void as against public policy.[9] *Barham v. Barham*, 33 Cal. 2d 416, 202 P.2d 289 (1949). Given that the requirement of "consideration in money or money's worth" for Federal estate tax purposes invokes a higher standard of consideration than that required to establish the validity of a contract under State law (*Estate of Davis v. Commissioner*, 57 T.C. 833, 835 (1972); *Estate of Pollard v. Commissioner*, 52 T.C. 741, 744 (1969); *Estate of Tiffany v. Commissioner*, 47 T.C. 491, 500 (1967); 1 J. Mertens, Law of Federal Gift and Estate Taxation, sec. 5.03 (1959)), we conclude that Jennie's waiver of her support rights, an invalid consideration under California law, clearly does not meet the Federal estate tax requirement. *Ellis v. Commissioner*, 51 T.C. 182 (1968).

Jennie's waiver of the rights she would otherwise have had in her husband's earnings is an altogether different matter. Under California law, a spouse's personal service compensation earned during marriage is community property. Cal. Civ. Code sec. 5108, 5110 (West 1983); e.g., *Thorpe v. Thorpe*, 75 Cal. App. 2d 605, 171 P.2d 126 (1946). Under section 5105 of the California Civil Code, the community interest of one spouse in the earnings of the other is "present, existing and equal." Cal. Civ. Code sec. 5105 (West 1983). However, the parties to an antenuptial agreement may validly waive the community interests that would otherwise accrue in each other's earnings during marriage. E.g., *Barker v. Barker*, 139 Cal. App. 2d 206, 293 P.2d 85 (1956).

---

[9]Although our review of California law indicates that the California courts have in the past adhered to the traditional view that any contractual attempts to delimit the parties' support obligations violated the public policy favoring marriage, we note that the decision *In re Marriage of Dawley* 17 Cal. 3d 342, 551 P.2d 323 (1976), would seem to presage a more liberal judicial attitude toward antenuptial agreements that modify marital support obligations.

In the present case, even if we were to assume, arguendo, that parties to an antenuptial agreement could validly modify their support obligations, our determination herein would remain unchanged. Here, the waiver of support rights was reciprocal, and therefore Jennie's waiver of her right to support was not consideration for the decedent's promise to devise a life estate to her under his will.

At the time of the execution of the antenuptial agreement, the decedent was employed as an automobile service manager and earned a salary of $12,414.01 in 1974. Although there is no evidence in the record as to the amount of decedent's earnings in prior and subsequent years, decedent's employment continued until February of 1976. Jennie, on the other hand, was not employed at the time of the marriage. Her income, which consisted of a pension as a retired school teacher and of social security benefits, would not have been community property under California law during the parties' marriage. *In re Marriage of Wilson*, 10 Cal. App. 3d 851, 112 Cal. Rptr. 405 (1974); *In re Marriage of Nizenkoff*, 65 Cal. App. 3d 136, 135 Cal. Rptr. 189 (1976). Thus, in the absence of an agreement, Jennie would have had a present and existing right to one-half of the decedent's earnings, although the decedent would not have acquired any comparable rights in Jennie's income. The decedent thus gave up nothing by his waiver of a community interest in Jennie's income but received a present economic benefit under the agreement through Jennie's waiver of her community interest in his earnings. This benefit, which enured to the decedent during his life, is clearly not the result of the relinquishment of "other marital rights" within the meaning of section 2043(b). *Estate of Ellman v. Commissioner, supra; Estate of Rubin v. Commissioner, supra; Estate of Glen v. Commissioner, supra.*

Respondent, in his reply brief, argues that Jennie's waiver of her community interest in the decedent's earnings does not constitute consideration for the transfer of the life estate, because, at the time of the execution of the agreement, the decedent and Jennie were not married and therefore Jennie did not then have any community property rights that she could relinquish. In support of his contention, respondent reasons that if no marriage had taken place after the execution of the agreement, then Jennie would have relinquished nothing. Respondent's reasoning, however, overlooks the fact that the entire agreement was executory and conditioned upon the parties' subsequent marriage, and that, if the parties had not married, Jennie would have had no right to a life estate in the Cromwell residence.

Furthermore, we note that a number of courts, in determining whether a particular marital right constituted an excluded

consideration under section 2043(b), have distinguished between a spouse's presently enforceable rights and those rights that are inchoate during the other spouse's life. *Merrill v. Fahs*, 324 U.S. 308, 311, (1945); *Estate of Ellman v. Commissioner*, 59 T.C. at 372; *Estate of O'Nan v. Commissioner*, 47 T.C. 648, 655 (1967); *Estate of Glen v. Commissioner*, 45 T.C. at 339. We believe that, in the case of an antenuptial agreement, the requirement that the marital right relinquished must be a presently enforceable right should be interpreted as requiring that the right must be enforceable during the life of the spouse who benefits by the release or waiver and not, as respondent contends, at the time of the execution of the agreement. *Estate of Glen v. Commissioner*, 45 T.C. at 339. We believe that this view is consistent with both the legislative purpose and well-settled judicial interpretation of section 2043(b).

Having determined that Jennie's waiver of her community interest in the decedent's earnings is not an excluded consideration under section 2043(b), we turn then to the question of whether it was "adequate and full." Respondent contends that a waiver of a spouse's community interest in the other spouse's earnings is not an "adequate and full" consideration because the spouse's interest would not be reducible to money value until termination of the marriage. Cf. secs. 20.2053–4, 20.2043–1, Estate Tax Regs. Respondent bases his conclusion on his observation that the spouse's interest in the other spouse's earnings would change daily. We disagree. In the first place, to the extent that respondent is arguing that a spouse's community interest is only determinable at the termination of the marriage, respondent's contention assumes that the spouse's interest is inchoate during marriage and ignores the express terms of section 5105 of the California Civil Code, which states that a spouse's community interest is "present, existing and equal" during marriage. Cal. Civ. Code sec. 5105 (West 1983); *See v. See*, 64 Cal. 2d 778, 51 Cal. Rptr. 888 (1966). Secondly, the fact that, at the time of the execution of the agreement, a mathematically accurate ascertainment of the present value of Jennie's relinquished community interest in the decedent's earnings would be impossible does not mean that the interest has no value. *Commissioner v. Maresi*, 156 F.2d 929 (2d Cir. 1946), affg. 6 T.C. 582 (1946); *Harrison v. Commissioner*, 17 T.C. 1350 (1952). We therefore conclude that

Jennie's waiver of her community interest in the decedent's earnings was a valuable consideration for Federal estate tax purposes.

Both the Ninth Circuit and this Court have held that the determination of the sufficiency of the consideration is to be made as of the date of the exchange. *United States v. Past*, 347 F.2d 7, 12 (9th Cir. 1965); *Estate of Gregory v. Commissioner*, 39 T.C. 1012, 1021 (1963). While we note that here the record does not contain the evidence that would be necessary to compute and compare the values of Jennie's relinquished community interest and of decedent's promise to devise Jennie a secondary life estate as of the date of the exchange, we also note that this Court has not interpreted the "adequate and full" consideration requirement as necessitating a precise dollar-for-dollar matching of consideration paid with the value of the transferred property. *Estate of O'Nan v. Commissioner*, 47 T.C. 648, 663 (1967). As we pointed out in *Estate of O'Nan*, if we were called upon to determine the income tax consequences to the decedent in the year of the exchange, we would presume the values of the two interests exchanged under the negotiated antenuptial agreement to be equal under the rule set forth in *Philadelphia Park Amusement Co. v. United States*, 130 Ct. Cl. 166, 172, 126 F. Supp. 184, 189 (1954), and endorsed by the Supreme Court in *United States v. Davis*, 370 U.S. 65, 72 (1962).

We believe that the facts of this case, like those in *Estate of O'Nan*, justify applying the *Philadelphia Park* presumption. Jennie and the decedent, who each had comparable financial resources and were then 73 and 75 years of age respectively, were represented by separate counsel in the negotiation of the agreement, and therefore it may be assumed that they bargained at arm's length with respect to their property. At the time that the agreement was negotiated, the decedent was employed but was afflicted with cancer. The decedent's promise of a secondary life estate was conditioned upon the parties' being married at the decedent's death. Given these circumstances, we do not believe that any readily ascertainable value can be attributed to the interests exchanged. We conclude, therefore, that the interest surrendered by Jennie in the decedent's earnings was equivalent in value to the decedent's

promise to devise Jennie a secondary life estate in the Cromwell residence.

Having determined that Jennie's claim under the antenuptial agreement was supported by full and adequate consideration, we hold that the estate is entitled to the deduction for claims authorized by section 2053(a)(3). Respondent in his notice of deficiency determined that the amount allowable as a deduction was $10,000, the amount Jennie received upon relinquishing her life estate approximately 4 months after the decedent's death. Although on brief petitioner contends that the $10,000 payment made to Jennie in exchange for her life estate reflects "personal consideration" rather than the true fair market value of Jennie's claim, petitioner has failed to enlighten us as to the nature of these contentions and has failed to introduce any evidence to support this contention.[10] The burden was on petitioner to prove that respondent's determination was erroneous. Rule 142(a). This he has failed to do. We find, therefore, that respondent's determination in the deficiency notice as to the value of Jennie's claim against the estate must stand.

*Decision will be entered for the respondent*

---

Reviewed by the Court.

DAWSON, FAY, SIMPSON, STERRETT, CHABOT, NIMS, PARKER, WHITAKER, COHEN, CLAPP, and SWIFT, *JJ.*, agree with the majority opinion.

WILBUR and GERBER, *JJ.*, did not participate in the consideration of this case.

---

[10]The only evidence introduced by petitioner on the valuation issue was the notice of determination of inheritance tax issued by the California State Controller's Office. The notice included Jennie's life estate in the California gross estate at its actuarial value using the 6-percent U.S. life table as required by sec. 13954 of the California Revenue & Taxation Code. Petitioner's description of the valuation as an "arms length competent appraisal" forces us to the conclusion that petitioner does not understand either that the value was derived actuarially and not by appraisal or that the determinations of the California taxing authority with respect to the *California inheritance tax* have no bearing upon the determination of *Federal estate tax* liability.

NIMS, *J.*, concurring: I am in full agreement with the majority, but I think *Estate of Johnson v. Commissioner*, 77 T.C. 120 (1981), revd. 718 F.2d 1303 (5th Cir. 1983), should be expressly overruled in this case.

SIMPSON, CLAPP, and JACOBS, *JJ.*, agree with this concurring opinion.

---

KÖRNER, *J.*, dissenting: I must respectfully dissent from the majority opinion in this case. In my view, the majority has arrived at an erroneous result here, which is based upon an erroneous analysis of the situation which is presented in this case, and a failure to apply the established law to the correct set of facts.

The facts are relatively simple and were fully stipulated:

On August 3, 1972, decedent created a trust, with himself as trustee, which was revocable and which reserved all the life interest to himself. Upon his death, the trust was to become irrevocable and two trusts were created, one for the benefit of his son, and the other for the benefit of his two grandchildren. The decedent's home place in Santa Clara, California (the Cromwell residence), was conveyed to the trust as part of the trust corpus a couple of months thereafter.

On the same date as the creation of the trust, August 3, 1972, decedent executed his will, in which, after making specific provisions for his personalty, he devised and bequeathed all the rest and residue of his estate as a pourover into the inter vivos trust.

Almost 2 years later, on June 21, 1974, and in contemplation of marriage, decedent entered into an antenuptial contract with Jennie Whitlatch (Jennie). That contract provided, inter alia, that Jennie should receive a life estate in the Cromwell property, if decedent predeceased her and if Jennie was still married to him at that time. Thereafter, and prior to her death, Jennie's life estate could be terminated only if she relinquished it or if she should remarry. The contract (clearly conditioned on the parties' subsequently marrying, which they did on August 10, 1974) specifically provided that decedent would amend his will to carry out the provisions of the agreement, *but it also provided (in section 3.07 thereof) that the parties would enter into any other documents which would*

*be necessary to carry out the purposes and intentions of the antenuptial agreement.*[1]

At the time the antenuptial agreement was executed, decedent had already conveyed the Cromwell property to the trust, so that it was impossible for him to amend his *will* in any way which would give Jennie the agreed life estate therein. The only way the agreement could be carried out was to amend the trust instrument so as to provide for Jennie's life estate, contingent upon her surviving decedent and being married to him at the time of his death. In fact, decedent amended neither his will nor his trust prior to his death on December 26, 1977. On that date, Jennie was still married to decedent, and survived him.

On this set of facts, I would conclude as follows:

The antenuptial agreement was not just a contract to make a will, as the majority appears to hold. It was an executory contract which became operative upon decedent's and Jennie's getting married, and its clear intention was to provide for Jennie a life estate in the Cromwell property, contingent only upon her surviving decedent and being married to him at the date of his death. I think that what was intended here was the immediate creation in Jennie of a contingent future interest in the Cromwell property, both of which contingencies were in fact satisfied at the moment of decedent's death.

The proper way to have carried out this intention was for decedent to have amended the trust instrument to clearly give Jennie her contingent future interest, after decedent and Jennie were married on August 10, 1974. At the moment of decedent's death, the trust instrument would be self-executing, and Jennie's contingent future interest would vest in possession, being terminated only by a later relinquishment by Jennie or by her remarriage, both of which events were under her control. The recital in the antenuptial agreement about decedent's amending his will reflects a confusion either of decedent or his attorney as to what the legal situation was. I do not think that this reference to amending the will should be narrowly construed as nothing more than a contract to make a will (which would be ineffective), especially in view of the obligation in the contract to execute any other documents

---

[1] The majority fails to find this critical fact, which was an integral part of the antenuptial agreement, a stipulated exhibit in this record.

necessary to carry out the contract provisions. To construe the antenuptial contract in this manner could be viewed as an attempt on the part of decedent to deceive or defraud Jennie of the life estate following decedent's death, *which she clearly contracted for, and which the majority correctly holds was supported by full and adequate consideration.*

Thus, I think the present facts present a clear case for the application of the doctrine of equitable conversion. This ancient and well-known doctrine rests upon the principle that equity regards things which are directed to be done as actually having been done, where nothing has intervened which ought to prevent performance. It is well recognized as the law in California. *Parr-Richmond Industrial Corp. v. Boyd*, 43 Cal. 2d 157, 272 P.2d 16 (1954); *McCaughna v. Bilhorn*, 10 Cal. App. 2d 674, 52 P.2d 1025 (1935). As it applies to the present situation, the application of the doctrine was aptly stated by the Supreme Court of California many years ago:

> When a contract for sale of real property binding on the parties is executed, an equitable conversion is worked; the purchaser of the land is deemed the equitable owner thereof, and the seller is considered the owner of the purchase price. The equitable conversion thus deemed to exist from the time a valid contract of sale is entered into may or may not be absolute. Whether it is, or not, will depend upon whether the terms of the contract of sale are subsequently complied with. If there is no default in that respect, but, on the contrary (and dealing now with the contract involved here), the purchaser performs all the conditions precedent which under the contract entitle him to a conveyance on a given day, he will be deemed on that day to be the owner of the land and the seller to be the owner of the purchase money. The fact that the contracting owner of the land refuses to perform his part of the agreement and make the conveyance to which the purchaser is entitled, on compliance with the contract, cannot affect the status or rights of the parties as to the property.
>
> The purchaser having performed or offered to perform his covenants at the date when the contract called for a conveyance to him, equity considers the property as belonging to him as of that date, and the owner as simply holding the legal title in trust for him. * * *
> [*In re Dwyer's Estate*, 159 Cal. 664. ____, 115 P. 235, 240 (1911).]

The equitable conversion takes place at the time when the conveyance should have been made, under the effective contract. This depends upon the contract and the intention of the parties as to when it should be effective. *Baker v. Commissioner of Corporations and Taxes*, 253 Mass. 130, 148 N.E. 593 (1925). When the effectiveness of the contract is subject to the

happening of a future event, the conversion will take place when the contingency occurs, so as to carry out the intention of the parties. *Rockland-Rockport Lime Co. v. Leary*, 203 N.Y. 469, 97 N.E. 43 (1911).

In the instant case, the future event which made the antenuptial contract operative was the marriage of Jennie and decedent. Viewed as a contract for the conveyance of an interest in property, as I think the antenuptial contract should be construed, I think that Jennie had a right to specific performance under California law (*Parr-Richmond Industrial Corp. v. Boyd, supra; Utley v. Smith*, 134 Cal. App. 2d 448, 285 P.2d 986 (1955); *In re Dwyer's Estate, supra*). So viewed, it should be held that Jennie, through the doctrine of equitable conversion, had an equitable interest in the Cromwell property—an interest which she had bought and paid for—which was transformed from a future interest to a possessory interest at the moment of decedent's death. What is involved here is simply an interest which Jennie acquired by purchase from decedent in an arm's-length contractual negotiation. Prior to decedent's death, such rights were contingent, but they became fully vested at the moment of his death.

The value of Jennie's life estate should accordingly be excluded from decedent's gross estate under section 2033 and the exception clause of section 2036(a).[2] Applying the appropriate valuation table for a female aged 77 (Jennie's age at the time of decedent's death), in accordance with respondent's regulations, sec. 20.2031–10(c), table A(2), Estate Tax Regs., a factor of .35307 is produced which, when applied to the apparently agreed value of the Cromwell property ($89,000), produces a value of $31,423 for Jennie's life estate.

---

[2]Sec. 2036(a) reads as follows:

SEC. 2036(a). GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

  (1) the possession or enjoyment of, or the right to the income from, the property, or

  (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

It follows that petitioner's amended position herein should be sustained.[3]

GOFFE, SHIELDS, HAMBLEN, and WRIGHT, *JJ.*, agree with this dissent.

---

[3]The majority opinion declines to consider the doctrine of equitable conversion as a proper basis for decision in this case, on the grounds that this "issue" was not raised by either party, and, in any event, is of doubtful applicability (see majority opinion note 7). While the majority is clearly entitled to its opinion as to the applicability of the doctrine to the facts of this case, I do not think that it is proper to refuse to consider it at all. No "new issue" is being raised here; the issue is the same, viz, whether Jennie had an interest in the Cromwell residence at the time of decedent's death which was properly excludable from his gross estate. Petitioner claimed that she did; respondent claimed that she did not. Neither side addressed the doctrine of equitable conversion; this is a new legal *theory*, true enough, but it does not change the *issue* between the parties which was properly before the Court. It simply presents a new basis upon which the existing issue can be decided. Nor is the doctrine of equitable conversion to be considered as a "new matter." It does not alter or increase the original deficiency determination, nor does it call for the introduction of any new or different evidence. Cf. *Sorin v. Commissioner*, 29 T.C. 959 (1958), affd. per curiam 271 F.2d 741 (2d Cir. 1959); *Estate of Jayne v. Commissioner*, 61 T.C. 744 (1974), appeal dismissed 7th Cir. (1975); *Achiro v. Commissioner*, 77 T.C. 881 (1981).

If the majority entertains doubt as to whether the doctrine of equitable conversion is properly applicable in this case under controlling California law, as I believe it to be, then it is entirely proper to call on the parties for additional briefing on the subject, given the fact that neither party addressed it at trial or on brief. Rule 151(a). To refuse to consider the theory at all, however, seems to me to be improper on at least two grounds:

(a) It permits the parties, at least by omission, to control the basis upon which this Court decides cases which are presented to it.

(b) To refuse to consider an established legal doctrine of which we are aware, and which may provide the correct basis of decision, simply because neither party has had the wit to address it, is to abdicate our judicial responsibility to decide cases correctly, under the law as we are given the light to see it.