ESTATE OF ANTHONY J. FRANK, SR., DECEASED, ANTHONY JEFFREY FRANK, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF MARGARET E. FRANK, DECEASED, ANTHONY JEFFREY FRANK, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Frank v. Commissioner
Docket Nos. 15103-92, 15104-92
United States Tax Court
T.C. Memo 1995-132; 1995 Tax Ct. Memo LEXIS 178; 69 T.C.M. (CCH) 2255; March 28, 1995, Filed *178 Decisions will be entered under Rule 155. For petitioners: Douglas G. Dye. For respondent: Lisa Primavera-Femia. [1]
PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined a deficiency of $ 274,120 in the estate tax of petitioner Estate of Anthony J. Frank, Sr. (hereafter referred to as petitioner Anthony's estate). Respondent determined a deficiency of $ 390,461 in the estate tax of petitioner Estate of Margaret E. Frank (hereafter referred to as petitioner Margaret's estate). The issues for decision are: (1) Whether 91 shares of common stock of Magton, Inc., transferred shortly before decedent Anthony's death are includable in petitioner Anthony's gross estate pursuant to sections 2038(a)(1) and 2035(d)(2). [2] We hold that they are not. (2) The second issue is one of valuation and is divided into two subparts: (a) Whether the value of petitioner Anthony's estate's interest in the stock of Magton, Inc., is $ 6,574 per share as determined by respondent. We hold that *179 the per-share value is $ 5,528. (b) Whether the value of petitioner Margaret's estate's interest in the stock of Magton, Inc., is $ 5,976 per share as determined by respondent. We hold that the per-share value is $ 5,528. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petitions herein were filed, executor Anthony J. Frank resided in Ocean City, New Jersey. Decedents Anthony and Margaret were husband and wife. Anthony died on October 26, 1988; Margaret died on November 10, 1988. At the time of their deaths decedents owned shares in Magton, Inc. (Magton). Magton is a closely held New Jersey corporation incorporated in 1964. Magton was authorized to issue 1,000 shares *180 of common stock, par value $ 100 per share. As of June 1, 1988, a total of 501 shares of Magton common stock was issued and outstanding. The shares were owned as follows: Anthony J. Frank, Sr.
252 shares
Margaret E. Frank
68 shares
Anthony J. Frank (decedents' son; hereafter
referred to as Anthony Jr.)
80 shares
David E. Frank (decedents' son)
80 shares
Margaret F. Frank (decedents' daughter)
21 shares
Magton was a family-run business. Decedent Anthony was the president of Magton. He made all of the most important decisions and directed corporate policy. Decedent Margaret was the secretary of Magton. She had minimal involvement in running the business. Their daughter Margaret, prior to her death, was the executive housekeeper. Anthony Jr. handled the day-to-day operations as the general manager and vice president. David was also a vice president and corporate controller. In addition, Anthony Jr.'s and David's wives worked in the business. At the time of decedents' deaths, among the assets of Magton were three motels: The Beach Club (formerly named the Sting Ray), the Impala, and the Tahiti. All three motels were located in Ocean City, New Jersey, a family-oriented *181 seashore resort. The three motels were appraised by Carroll-McIlhinney, Inc. (real estate appraisers and consultants), as follows: 3/20/84
2/13/86
11/10/88 Beach Club
$ 3,500,000
$ 4,000,000
$ 4,400,000
Tahiti Motel
1,350,000
1,500,000
1,800,000
Impala Motel
3,000,000
3,400,000
3,150,000
The Impala is located near the ocean; it consists of 109 units, a 110-seat restaurant, and two swimming pools. The Tahiti is closer to the ocean than the Impala. It consists of 54 units, a 64-seat restaurant, and a swimming pool. The Tahiti was sold by Magton to an unrelated party in an arm's-length sale on April 10, 1989, for $ 2,100,000. The Beach Club consists of 82 units, a 76-seat restaurant, and a swimming pool. Between October 1987 and May 1988, renovations costing approximately $ 1 million were made to the Beach Club. At or about the dates of death, the aggregate number of rooms of the motels owned by Magton was 15-20 percent of the total rooms in Ocean City. In 1986, Magton sold an undeveloped parcel of land which adjoined the Impala to PDT Enterprises (PDT), a corporation owned by the children and decedent Anthony. PDT developed a 28-unit condominium development *182 on that parcel, the Wild Dunes. All but one of the condominium owners rent their units to vacationers. Magton had leasing, housekeeping, and maintenance contracts with these owners. Pursuant to the leasing contracts, Magton acted as rental agent for the condominium owners. The contracts were for terms of 1 year. Since 1986, Magton has entered into these contracts and has generated revenue from such contracts. The shares of common stock of Magton were valued on the Federal estate tax returns for Anthony's and Margaret's estates at $ 5,000 per share. The valuation was based upon a buy and sell agreement dated July 20, 1983, entered into by the Magton shareholders. Decedent Anthony created a revocable trust dated June 1, 1988, appointing decedent Margaret and himself as trustees. Relevant terms of the trust agreement follow. The beneficiaries of the trust were decedent Anthony's wife (i.e., decedent Margaret), his children, and his grandchildren. Distributions from the trust could be effected in one of two ways: (1) Upon written request of decedent Anthony; or (2) at the trustees' discretion for the welfare, comfort, or support of decedent Anthony or any of his dependents. *183 Decedent Anthony as grantor, alone, retained the power to alter, amend, or revoke all or any part of the trust. On July 1, 1988, decedent Anthony created a power of attorney appointing his son, Anthony J. Frank, as attorney in fact to, inter alia, "withdraw and receive the income or corpus of a trust" for decedent Anthony's benefit. Further, the power of attorney granted decedent Anthony's attorney in fact the power "to make gifts, without consideration in any amount to anyone, including my attorney, outright or in trust." On October 24, 1988, Anthony Jr., acting on his father's behalf pursuant to the power of attorney, withdrew 91 shares of Magton stock from the revocable trust, which were placed in his father's name, as evidenced by share certificate No. 21. Those shares were then transferred to decedent Margaret, as reflected in share certificate No. 22, issued to her on the same date. Decedent Anthony died on October 26, 1988. The executor filed Form 706, United States Estate Tax Return, including 161 shares of Magton in decedent Anthony's gross estate. The executor did not include the stock transfer from the revocable trust as part of Schedule G, which requests a listing *184 of transfers made within 3 years of death. Decedent Margaret died on November 10, 1988. The executor filed Form 706, including 159 shares of Magton in decedent Margaret's gross estate. The 159 shares include the 91 shares transferred from decedent Anthony through his attorney in fact. In the statutory notices of deficiency respondent determined deficiencies in petitioners' Federal estate tax. The greater part of the deficiencies, and the only parts here in issue, result from respondent's determination that shares of corporate stock were undervalued on petitioners' Federal estate tax returns, and that the amount of such shares includable in petitioner Anthony's estate was understated. Furthermore, respondent disallowed petitioners' claim for refund of estate tax attributable to the payment of additional State death taxes. However, this item was subsequently conceded by respondent upon substantiation by petitioners. OPINION Issue 1. Transfer of the 91 Shares
Respondent contends that the transfer of the 91 shares of Magton from the revocable trust to decedent Margaret constitutes a relinquishment by decedent Anthony, through his attorney in fact, of his power to alter, *185 amend, or revoke the trust with respect to those shares and, therefore, the shares are includable in petitioner Anthony's estate. Petitioner Anthony's estate argues that the transfer was a gift made by Anthony, through his attorney in fact, to his wife decedent Margaret and not a transfer from the trust. Petitioner Anthony's estate maintains that Anthony did not relinquish a power over the trust, but rather exercised a power to withdraw the shares from the trust and then made a gift of them to decedent Margaret. Therefore, it is contended that the shares are not includable in petitioner Anthony's estate. The Federal estate tax imposes a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. Sec. 2001; U.S. Trust Co. v. Helvering, 307 U.S. 57, 60 (1939). The taxable estate is defined as the decedent's gross estate, less specified deductions. Sec. 2051. Pursuant to sections 2031 and 2033, the value of the gross estate includes the value of all property to the extent of the interest therein of the decedent at the time of his death. Further, the gross estate also may include property in which *186 the decedent did not have an interest at the time of his or her death. Estate of Levin v. Commissioner, 90 T.C. 723, 727 (1988), affd. without published opinion 891 F.2d 281 (3d Cir. 1989); sec. 20.0-2(b)(2), Estate Tax Regs. Sections 2035 through 2038 address interests in property transferred by the decedent during his lifetime under such circumstances as to bring the interests within the decedent's gross estate. Sec. 20.2031-1(a)(2), Estate Tax Regs. The provisions on which respondent relies in the case at bar are sections 2035(a) and 2038(a)(1). Section 2035(a) generally provides for the inclusion in the gross estate of any transfers made by the decedent within 3 years of the decedent's death. That section, however, is limited by subsection (d), which provides in relevant part as follows: SEC. 2035(d). Decedents Dying After 1981. -- (1) In general. -- Except as otherwise provided in this subsection, subsection (a) shall not apply to the estate of a decedent dying after December 31, 1981. (2) Exceptions for certain transfers. -- Paragraph (1) of this subsection * * * shall not apply to a transfer of an interest *187 in property which is included in the value of the gross estate under section 2036, 2037, 2038, or 2042 or would have been included under any of such sections if such interest had been retained by the decedent.
Thus, section 2035(d)(1) provides that the general rule of section 2035(a) shall not apply to the estates of decedents dying after December 31, 1981. Accordingly, a transfer by such a decedent within 3 years of death generally is not included in the gross estate. Estate of Jalkut v. Commissioner, 96 T.C. 675, 678 (1991). However, section 2035(d)(2) provides that subsection (d)(1) does not apply, and consequently, that section 2035(a) does apply, if the decedent makes, within the 3-year period, a transfer of a property interest described in section 2035(d)(2). The value of such a transfer is therefore included in the gross estate. Estate of Jalkut v. Commissioner, supra.Decedent Anthony died in 1988, after the effective date of section 2035(d). Of the various sections enumerated in section 2035(d)(2), we are concerned with section 2038, which provides in relevant part: Sec. 2038. REVOCABLE TRANSFERS. *188 (a) In General. -- The value of the gross estate shall include the value of all property -- (1) Transfers after June 22, 1936. -- To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3-year period ending on the date of the decedent's death.
Thus, the value of the gross estate includes the value of any interest transferred by the decedent, the enjoyment of which is at the time of his death subject to change by virtue of the decedent's retention of the power to alter, amend, revoke, or terminate, or where such power is relinquished during the 3-year period ending with the decedent's death. Estate of Jalkut v. Commissioner, supra at 680. *189 Respondent asserts that the Court should disregard the form of the transaction, whereby the 91 shares of Magton were withdrawn from the trust and retitled in decedent Anthony's name before being transferred to decedent Margaret, and find that such a transfer constitutes a relinquishment of decedent Anthony's powers over the transferred property pursuant to section 2038(a)(1). Petitioner Anthony's estate contends that decedent Anthony, through his attorney in fact, exercised his power to withdraw assets from the trust, and the subsequent transfers were gifts made by decedent Anthony in his individual capacity to the donee. Accordingly, petitioner Anthony's estate argues that because the withdrawn assets were not subject to inclusion in the gross estate pursuant to section 2038, section 2035(d)(2) does not control, and the gift is excluded from the gross estate under section 2035(d)(1). Both parties cite Estate of Jalkut v. Commissioner, supra, in support for their arguments. We agree that Estate of Jalkut is relevant, and accordingly, we will discuss its application to the instant case. The determination of whether transfers occurring within *190 3 years of death are to be included in a decedent's gross estate pursuant to section 2038 turns on the particular terms of the trust agreement, Estate of Jalkut v. Commissioner, supra at 684, and the specific powers granted therefrom, Estate of Barton v. Commissioner, T.C. Memo. 1993-583. In Estate of Jalkut v. Commissioner, supra at 676, the decedent was given the express power, as settlor, to effect withdrawals of principal. During 1984 and 1985 decedent made transfers from the revocable trust to two irrevocable trusts for the benefit of members of his family. Id. at 677. With respect to the initial transfers, made in 1984, we concluded that the decedent had made withdrawals from the revocable trust followed by gifts over to the donees. Id. at 685. We noted that at the time those transfers were effected, the decedent was the sole permissible distributee of the income and principal of the revocable trust. Id. Therefore, the gift transfers could only have been effected pursuant to the decedent's power to withdraw *191 income and principal from the trust. Id.
We stated in Estate of Jalkut that by characterizing the transfers as withdrawals preceding direct gift transfers from the decedent, it necessarily followed that the transfers did not constitute a relinquishment of the decedent's power to alter, amend, revoke, or terminate the trust with respect to the transferred assets as contemplated under section 2038. Id. Accordingly, we held that the withdrawn assets were not subject to inclusion in the gross estate pursuant to section 2038; that section 2035(d)(2) did not control; and that the gift was excluded from the gross estate under section 2035(d)(1). Id.; see also Estate of Kisling v. Commissioner, T.C. Memo. 1993-262, revd. 32 F.3d 1222 (8th Cir. 1994). However, as to subsequent transfers from the revocable trust, we reached the opposite conclusions. Estate of Jalkut v. Commissioner, 96 T.C. at 685-686. These transfers were made after the decedent, on account of his deteriorating health, had been replaced as trustee by successor cotrustees. These cotrustees made the subsequent transfers. *192 Under the terms of the trust, they held the power and the discretion to distribute principal and income for the support, care, and welfare of the grantor and his descendants. We held that these transfers by the successor trustees were to be considered a relinquishment of the grantor's power to revoke the trust with respect to the transferred assets. Consequently we concluded that sections 2038 and 2035(d)(2) required the inclusion of those gifts in the gross estate. Id.; see also Estate of Barton v. Commissioner, supra.
In the instant case, at the time of the transfer decedent Anthony and his spouse, as cotrustees, had the authority to effect transfers from the revocable trust. Further, as grantor, decedent Anthony reserved power to withdraw income or principal from the trust. We find that decedent Anthony effected a withdrawal from the revocable trust, through his attorney in fact. Respondent urges us to apply the doctrine of substance over form. Respondent argues that we should disregard the transfer from the revocable trust to decedent Anthony, as accomplished through his attorney in fact, under the premise that it was made solely *193 to obtain a minority discount in the valuation of the Magton stock for estate tax purposes. Petitioner Anthony's estate argues that there was no tax avoidance plan. Moreover, petitioner Anthony's estate asserts that a substantial block of stock was transferred (approximately 18.2 percent of the total outstanding shares). This reduced decedent Anthony's ownership from 50.3 percent to 32.1 percent. If tax avoidance was the sole motive, a substantially smaller number of shares could have been transferred. We find it unnecessary to decide this dispute over the motive for the transfer. As a general rule, we will respect the form of a transaction. We will not apply substance over form principles unless the circumstances so warrant. Gregory v. Helvering, 293 U.S. 465 (1935); Estate of Jalkut v. Commissioner, supra at 686. In the instant case, decedent Anthony created a power of attorney vesting his son with authority to perform specific acts, including the authority to "withdraw and receive the income or corpus of a trust" on decedent Anthony's behalf, and to "make gifts, without consideration in any amount to anyone." *194 In the exercise of that power, the son withdrew the 91 shares of Magton from the trust, which were placed in decedent Anthony's name before being transferred from decedent Anthony to decedent Margaret. The transactions were respected by Magton as evidenced by its issuance of share certificates, No. 21 to decedent Anthony, followed by No. 22 to decedent Margaret. [3]
Accordingly, we conclude that decedent Anthony exercised his power to withdraw assets from the trust and subsequently made a gift in his individual capacity to the donee. We therefore hold that the 91 shares transferred from the revocable trust are not to be included in petitioner Anthony's estate. Issue 2. Valuation of Magton Stock
Because we *195 held that the 91 shares are not includable in petitioner Anthony's estate, only 161 shares (252 minus 91) are so includable. The 91 shares are includable in petitioner Margaret's estate; at her death decedent Margaret owned a total of 159 shares (91 plus 68). Therefore each of decedents died possessed of only a minority interest in Magton. Because they died within 15 days of each other, the following analysis of the fair market value of the shares applies equally to both estates. The general rule for valuing property to be included in a decedent's gross estate is provided in section 2031 and the regulations thereunder. Property includable in a decedent's gross estate is included at its fair market value as of the date of the decedent's death or the alternate valuation date as provided under section 2032. Secs. 2031(a) and 2032(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is a question of fact with the trier of fact having the duty to weigh all relevant evidence of value and to draw appropriate inferences. Commissioner v. Scottish American Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938); *196 Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Fair market value represents the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); Gillespie v. United States, 23 F.3d 36 (2d Cir. 1994); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989); sec. 20.2031-1(b), Estate Tax Regs. All relevant facts and elements of value as of the applicable valuation date should be considered in every case. Estate of Johnson v. Commissioner, 77 T.C. 120, 124 (1981), revd. on other grounds 718 F.2d 1303 (5th Cir. 1983); sec. 20.2031-1(b), *197 Estate Tax Regs. Knowledge of future events not known or reasonably anticipated on the valuation date that might affect the value of the stock cannot be attributed to the willing seller or buyer. Estate of Bennett v. Commissioner, T.C. Memo. 1993-34; sec. 20.2031-1(b), Estate Tax Regs. The willing buyer and seller are hypothetical persons, instead of specific individuals or entities. Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). The fair market value of property is not to be determined by a forced sale price. Sec. 20.2031-1(b), Estate Tax Regs. Nor is the fair market value of property to be determined by the sale price of the property in a market other than that in which such property is most commonly sold to the public. Id.
In determining the value of stock that is not listed on an exchange, actual arm's-length sales of such stock in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979). *198 However, if the stock has never been publicly traded, and there is no evidence of any sales of stock in the corporation at any time near the date of a decedent's death, the value of the closely held stock must be determined indirectly, by weighing the corporation's net worth, prospective earning power, dividend-paying capacity, and other relevant factors. Estate of Andrews v. Commissioner, supra; Estate of Leyman v. Commissioner, 40 T.C. 100, 119 (1963), affd. in part and remanded in part 344 F.2d 763 (6th Cir. 1965), vacated and remanded 383 U.S. 832 (1966); sec. 20.2031-2(f), Estate Tax Regs. These factors cannot be applied with mathematical precision. Estate of Andrews v. Commissioner, supra at 941. Rather, the weight to be given to each factor must be tailored to account for the particular facts of each case. Messing v. Commissioner, 48 T.C. 502, 512 (1967). Similarly, section 2031(b) provides that the value of unlisted stock "shall be determined by taking into consideration, in addition *199 to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." [4]
*200 This Court has recognized that the valuation of stock in a closely held family corporation is often a difficult question. Estate of Tompkins v. Commissioner, T.C. Memo. 1961-338. "[Fair market] value is a fact, the determination of which is, at least, generally difficult. The result is rarely satisfactory." Estate of McKitterick v. Commissioner, 42 B.T.A. 130, 136 (1940). Before placing a value on the stock, it is frequently helpful to determine the fair market value, as of the valuation date, of the underlying assets. Id.
Both parties relied upon experts to consider and analyze the value of the corporation's real estate in order to derive a valuation of the corporation's stock. However, due to fundamental differences in approach between the parties' experts, particularly with respect to the weight to be placed upon net-asset value as opposed to earnings capacity or a going-concern value, and with respect to the adjusted book value of the assets, the valuations determined by the experts were quite far apart. Respondent's determination of the fair market value of the stock is presumed correct, and petitioners *201 bear the burden of overcoming the presumption of correctness. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Estate of Carli v. Commissioner, 84 T.C. 649 (1985); Hutchens v. Commissioner, T.C. Memo. 1993-600; Estate of Yeager v. Commissioner, T.C. Memo. 1986-448. At trial, we received testimony from expert witnesses, and we weigh that testimony in light of the experts' qualifications as well as all the other credible evidence. Estate of Newhouse v. Commissioner, supra; Estate of Gilford v. Commissioner, 88 T.C. 38, 56 (1987). Nonetheless, we are not bound by the opinion of any expert witness and will accept or reject expert testimony in the exercise of sound judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, supra; Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). We may adopt some portions and reject other portions of expert *202 testimony as we weigh its persuasiveness and helpfulness. Chiu v. Commissioner, 84 T.C. 722, 734 (1985); Estate of Bennett v. Commissioner, T.C. Memo. 1993-34. Furthermore, we recognize, "'Valuation is . . . necessarily an approximation . . . It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence.'" Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976) (quoting Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957)), affg. T.C. Memo. 1974-285; Estate of Bennett v. Commissioner, supra.
Both experts employed an approach based on the asset values of Magton, albeit petitioners refer to their expert's approach as an "adjusted book value approach" and respondent refers to her expert's approach as an "adjusted net worth approach." In addition, petitioners' expert attempted to factor in the use of leveraged funds to a hypothetical buyer. To this *203 end, petitioners' expert reduced value by an amount of purchase price that a buyer of the assets could finance. Petitioners' expert argues that a hypothetical investor would not pay more for the stock than he would have to put down in cash to purchase the motels as separate assets. Petitioners' expert contends that a buyer, when purchasing the motels as separate assets, could borrow 75 percent of the purchase price and deduct the interest payments and depreciation on the full cost basis (i.e., including debt). We reject this "leverage" part of petitioners' expert's analysis. A fundamental problem with his analysis is that the borrowed funds have economic substance and must be repaid. In fact petitioners' expert recognizes this fact in pointing out the depreciation is computed on the full cost basis. See Crane v. Commissioner, 331 U.S. 1 (1947). Petitioners' expert attempted to factor into his analysis comparable publicly traded companies. However, petitioners' expert placed a relatively small amount of weight on the comparables. Respondent challenged the use of the comparables; three of the companies operate chain type motels over a large geographical *204 area, cater to business or budget travelers, and have significant operations in businesses other than motel operation. None of the companies appears to be in the vacation/resort market, as is Magton. After reviewing the record, we find that the four companies are not engaged in sufficiently similar businesses to treat them as comparables. Estate of Hall v. Commissioner, 92 T.C. 312 (1989); Northern Trust Co. v. Commissioner, 87 T.C. 349 (1986). Another fundamental difference between the experts' opinions is attributable to the different asset values used for the motels. Petitioners' expert accepted the values computed in the report prepared by Carroll-McIlhinney. Respondent's expert did not accept those values in toto. Respondent's expert contends that the Impala and the Tahiti motels were undervalued. Because the Tahiti was sold at arm's length in April of 1989 for $ 2,100,000, we find that price to be the best evidence of the motel's fair market value rather than the $ 1,800,000 value in the Carroll-McIlhinney report. Furthermore, respondent's expert finds fault with the 1988 valuation ($ 3,150,000) ascribed *205 to the Impala because in comparison to the prior appraisals (1984 -- $ 3,000,000 and 1986 -- $ 3,400,000) and relative to the Tahiti[5] the Impala is undervalued. Respondent's expert would value the Impala at $ 4,300,000. Although Mr. McIlhinney has experience in appraising real property, we will not treat his report as an expert's report. He was not called to testify, and his report was not admitted into evidence as expert testimony. Rule 143(f); Estate of Dougherty v. Commissioner, T.C. Memo. 1990-274. However, Mr. McIlhinney's report has presented an analysis of the asset values based on empirical evidence and the relevant facts and circumstances. Based on the *206 record before us, we hold that the values of the motels at the dates of decedents' deaths are as follows: Beach Club
$ 4,400,000
Tahiti Motel
2,100,000
Impala Motel
3,850,000
Total asset value
10,350,000
Furthermore a difference exists as to the valuation of Magton's management contracts with owners of condominiums in the Wild Dunes. Respondent asserts that Magton has derived, and continues to derive, substantial revenue from the Wild Dunes management contracts. Petitioners contend that such contracts are for 1 year and therefore are of merely speculative or negligible value. Since the contracts have been executed each year that Wild Dunes has been in existence, starting with 1986, and due to the nature of the contracts, [6] we find that a value should be assigned to these contracts. Because petitioners have not offered any amount to the contrary and because we find the amount asserted by respondent to be reasonable in light of the prior revenue that has been generated, we hold that the value of the management contracts at the time of decedents' deaths was $ 225,000. *207 Because we believe that petitioners' expert's valuation is significantly distorted by the use of the leverage analysis and because petitioners have not met their burden of proving error in respondent's valuation, we find that the net asset value of Magton, before any discount for lack of marketability and minority interest, is equal to $ 4,946,000 ($ 5,396,000 (determined by respondent) less $ 450,000 (the fair market value of the Impala Motel, as adjusted from $ 4,300,000 to $ 3,850,000 by our holding above, see p. 21 supra)). We now turn to discounts for lack of marketability and minority interests. "The lack of marketability discount * * * is designed to reflect the fact that there is no ready market for shares in a closely held corporation." Estate of Andrews v. Commissioner, 79 T.C. at 953; see also Central Trust Co. v. United States, 158 Ct. Cl. 504, 305 F.2d 393, 405 (1962). This principle has been applied to controlling as well as minority shares. Estate of Maxcy v. Commissioner, T.C. Memo. 1969-158, revd. on other grounds 441 F.2d 192 (5th Cir. 1971). *208 A discount in the value of the closely held stock is appropriate for lack of marketability. Estate of Newhouse v. Commissioner, 94 T.C. at 249; Ward v. Commissioner, 87 T.C. 78, 106 (1986). The parties agree that a discount for lack of marketability is appropriate. Respondent's expert would apply a 35-percent marketability discount; petitioners' expert would apply a 25-percent marketability discount. Based on the evidence presented, including the experts' opinions and the empirical studies upon which they rely, we hold that a marketability discount of 30 percent is appropriate. We have held that a minority discount is appropriate if the block of stock does not enjoy the variety of rights associated with control. Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1582 (1987); Harwood v. Commissioner, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Andrews v. Commissioner, supra at 957. We have defined control to mean "that, because of the interest *209 owned, the shareholder can unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets." Estate of Newhouse v. Commissioner, supra at 251-252. Where indications of value are predicated upon control or complete ownership, a discount must be applied to provide indications of value for a minority or less-than-controlling interest. Estate of Jung v. Commissioner, 101 T.C. 412, 442 n. 11 (1993) (quoting Zukin & Mavredakis, Financial Valuation: Businesses and Business Interests, par. 6.9[2], at 6-39 (1990)). While the appropriate amount of discount to apply is a question of fact, it is generally unreasonable to argue that no discount should be considered for a minority interest in a closely held corporation. Estate of Newhouse v. Commissioner, supra at 249. In the instant case, each decedent's interest in Magton was insufficient to confer control over the corporation. The parties are in agreement that a 20-percent minority interest discount is appropriate. *210 Because we determined that the 91 shares transferred from the trust should not be includable in petitioner Anthony's estate, the minority discount applies to both petitioners. Applying a 30-percent lack of marketability discount to the net asset value of $ 4,946,000 and then a 20-percent minority interest discount, we hold that the value of Magton stock at the time of decedents' deaths was $ 2,769,760 or $ 5,528 per share ($ 2,769,760/501 shares). To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. The cases were tried by Attorney Mildred M. Moon, representing respondent. The cases were subsequently transferred to Attorney Lisa Primavera-Femia for posttrial briefing.↩
2. All section references are to the Internal Revenue Code in effect as of the dates of decedents' deaths, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. In McNeely v. United States, 16 F.3d 303, 305↩ n.1 (8th Cir. 1994), the Government conceded that if the stock involved had been retitled in the decedent's name before being transferred to her descendants, it would not have been includable in the decedent's gross estate.
4. In addition, we have recognized that the Commissioner's Rev. Rul. 59-60, 1959-1 C.B. 237, which both parties' experts have relied upon, has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value of stock of closely held corporations for estate tax purposes. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). The revenue ruling recognizes that a determination of fair market value is a question of fact and will depend upon the circumstances of each case: No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases. Often an appraiser will find wide differences of opinion as to the fair market value of a particular stock. In resolving such differences, * * * [the appraiser] should maintain a reasonable attitude in recognition of the fact that valuation is not an exact science. A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance. [ Rev. Rul. 59-60, 1959-1 C.B. at 238↩.]
5. The per-unit value of the Impala Motel was deemed by petitioners' expert to be 8 percent more than that of the Tahiti in 1984, and 10 percent more than that of the Tahiti in 1986, only to drop to 14 percent below that of the Tahiti as of November 1988, and 26 percent below the actual per-unit price paid for the Tahiti.↩
6. The contracts provided leasing, housekeeping, and maintenance services, including use of swimming pools located on the motel property owned by Magton, which are important amenities to the Wild Dunes vacationers.↩